OF THE

## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY.

### JUNE TERM, 1902.

63 809
f 63 831

MIRIAM BERGER, complainant and respondent,

*v.*

THE UNITED STATES STEEL CORPORATION, defendant and appellant.

[Filed October 11th, 1902.]

1. The act concerning corporations, as revised in 1896, authorizes corporations formed under it to retire shares of its preferred stock, purchased with bonds or the proceeds of bonds issued for that purpose, the provisions of sections 27 and 29 being complied with.

2. The offer to purchase *pro rata* must be made to all stockholders.

3. Such corporations have power to purchase and hold their own shares.

4. Such purchase and retirement of preferred shares does not deprive the stockholder who does not elect to sell of any vested right.

Berger *v.* U. S. Steel Corporation.

5. The provision in the twenty-ninth section that "certain shares" may be retired by purchase means that in proceeding under it the directors must declare how many shares they propose to retire, and failure to acquire that full number by purchase will not render the scheme abortive. It will be available to the extent that it can be carried out.

6. The supplement approved March 28th, 1902, is a restraining, and not an enlarging act, and its provisions must be observed to render the retirement of shares by purchase legal.

7. It is a general act applying to all corporations, excepting none. It changes the mere form of accomplishing what the act of 1896 authorizes to be done, and affects no vested right of a dissentient stockholder.

8. The manner in which a duly-authorized plan is to be carried through is part of the business of the corporation, and, in the absence of fraud or bad faith, is not the subject of judicial control to any greater extent than other business of the corporation. The court cannot substitute its judgment for that of the directors and majority stockholders and say that a less expensive plan could be successfully adopted.

9. *Quære.* In what respect and to what extent does the fifth section of the Corporation act of 1896 amplify the power of the legislature to alter or amend said act?

On appeal from an order advised by Vice-Chancellor Emery, whose opinion is reported in *18 Dick. Ch. Rep. 506.*

*Mr. Richard V. Lindabury* and *Mr. Charles L. Corbin,* for the appellant.

*Mr. Robert H. McCarter,* for the respondent.

The opinion of the court was delivered by

VAN SYCKEL, J.

The United States Steel Corporation was organized in February, 1901, under the General Corporation act of this state, and, by its original certificate of that date and its amended certificate filed April 1st, 1901, had an authorized capital stock of $1,000,000,000, divided into ten millions of shares of $100 each, equally divided as to number and amount between preferred and common stock.

The holders of preferred stock are entitled to be paid out of the net profits of the corporation yearly dividends at the rate of seven per cent. per annum, and no more, such dividends to be

cumulative and payable before any dividend can be paid on the common stock.

On the 1st day of April, 1902, the board of directors passed a resolution providing, among other things, that

"to the extent that holders thereof shall consent thereto, two million shares of the preferred stock of the corporation now outstanding shall be redeemed and be retired out of bonds or out of the proceeds of bonds of said corporation, which bonds shall bear interest at the rate of five per cent., payable semi-annually the principal payable in sixty years and redeemable at one hundred and ten after ten years, out of a sinking fund to be provided, or any other funds of the corporation,"

The bonds to be issued to be secured by mortgage on all the present and future property of the corporation and shares held by it in other corporations.

Reasonable opportunity was to be given to the preferred stockholders of record on a date to be fixed in the offer to subscribe for their ratable share of $200,000,000 of the bonds, payable in preferred stock at par, and being forty per cent. of their several holdings.

Notice of a special meeting of stockholders was duly given, as required by law, to take action upon the resolution of the directors relating to the issue of said bonds and the retirement of stock, at which meeting, held in May, 1902, the stockholders, by a vote of three million seven hundred and forty-five thousand seven hundred and thirty-one of preferred stock and three million nine hundred and fifty-eight thousand five hundred and fifty-seven of common stock in favor of the resolution, and four thousand eight hundred and sixty-five shares of preferred and seven thousand six hundred and seventy-five of common stock against the resolution, adopted the said resolution and approved and ratified the said action of the directors. A certificate of the adoption and ratification of the said resolution, signed by the president and secretary of the corporation, under its corporate seal, acknowledged or proved as in the case of deeds of real estate, together with the written assent, in person or by proxy, of two-thirds in interest of each class of such stockholders, was duly filed in the office of the secretary of state, as required by the twenty-seventh section of the "Act concerning corporations."

Thereupon, the complainant, who is a holder of preferred stock of the corporation, filed her bill to enjoin the issue of these bonds to retire the preferred stock.

At her instance an order was obtained in the court of chancery that an injunction should issue, which order is the subject of appeal to this court.

In presence of the fact that over ninety-nine per cent. of all the stockholders in attendance at the meeting, personally or by proxy, voted in favor of the resolution, it cannot reasonably be expected that the court is impressed with the belief that the complainant will suffer any substantial injury by the consummation of the scheme. Nevertheless, if it appears that the proposed action is without legal authority, the complainant cannot be denied the relief which she seeks, but, in passing upon this controversy, the greatest care must be observed that this overwhelming majority of the shareholders are not deprived of their rights by the very few dissentients.

The adjudicated cases in other states and in England, which have been cited and ably discussed on the argument before us, turn upon statutes so essentially differing from our own that they furnish very slight, if any, aid to the proper disposition of this case.

Not only does the English Companies' act differ from our Corporation act, but the English parliament is under no such constitutional restraint as is here the paramount law.

It is deemed to be unnecessary, therefore, to refer to such cases on this branch of the controversy.

The rights of the parties to this suit must rest upon the just interpretation of the language of our "Act concerning corporations" and of the terms of the certificate of incorporation and its amendment.

Some reliance is placed by the appellant upon the fact that at the time when the complainant became a stockholder a section of the by-laws was in force which provided that where any contract should be approved by the vote of a majority of the stockholders, at a meeting called for the purpose of considering such contract, it should be "as binding upon the corporation and

upon all the stockholders as though it had been approved or ratified by every stockholder of the corporation."

In my judgment this by-law has no significance in the present case as to the question of power, and cannot be invoked to validate, as to non-assenting shareholders, any act for the doing of which there is a want of legal authority in the legislative grant. Carried to its logical result, it would enable the majority to deprive the minority of their shares.

The question to be solved is whether the "Act concerning corporations," in connection with the certificate of incorporation filed under it, contains a grant of power to retire shares of stock in the manner adopted by the board of directors and ratified by the vote of the stockholders.

The twenty-seventh and twenty-ninth sections of the Corporation act of 1896 expressly provide for the retirement of both classes of stock.

The fifth section of the act provides

"that this act and all its amendments shall be a part of the charter of every corporation heretofore or hereafter formed under it, except so far as the same are inapplicable and inappropriate to the objects of such corporation."

The complainant, therefore, has no vested right to retain her shares in opposition to any lawful method provided for retiring them. Nor, under the provisions of our Corporation act, can any just basis be found for the assertion that her vested rights as a stockholder are impaired by the purchase by the corporation of its own shares of stock.

In *Chapman* v. *Ironclad Rheostat Co., 33 Vr. 497,* Mr. Justice Dixon, in an opinion delivered in our supreme court, very clearly demonstrates that, under the Corporation act of 1896, there is an implied grant of power to corporations to purchase shares of their own capital stock whenever such purchase is required for legitimate corporate purposes. Section 20 makes such shares personal property; section 1, subdivision 4, gives power to purchase such personal property as the purposes of the corporation shall require, except what is excepted in section 3, which exception does not include shares of its own stock. Therefore, in connection

with sections 29 and 38, the right of a corporation to purchase its own shares is necessarily implied.

This right is, also, so fully recognized by the twenty-ninth section, that it seems to be removed from debatable questions. That section provides that capital stock may be decreased by retiring shares owned by the corporation, which unquestionably implies the power to acquire and hold its own shares.

The first question to be considered is whether the appellant has power, under the act of 1896, to retire its shares in the proposed method which is now challenged by the respondent.

That act provides several ways in which stock may be retired by a vote of two-thirds in interest of each class of stockholders:

(1) By retiring or reducing any class of stock. This is compulsory, and must operate equally upon all holders.

(2) By lot, and this is also compulsory.

(3) By surrender of shares and the issue of a less number of shares *pro rata.*

(4) By the purchase, at not above par, of certain shares for retirement.

(5) By retiring shares owned by the corporation.

(6) By reducing the par value of shares.

It is important to notice that this legislation favors the capacity of corporations to retire their shares, by a two-thirds vote of the holders thereof, as it has provided every available way in which it can, with any degree of facility, be exercised, and, also, that this court adopted the opinion of Vice-Chancellor Pitney, in *Meredith* v. *New Jersey Zinc Co., 14 Dick. Ch. Rep. 257,* which held that, under the thirty-third section of the act of 1875, which authorized a corporation "to change the nature of its business," the corporation might purchase a reducing plant outside of this state and engage in business where it was located.

The vice-chancellor said: "It is fairly inferable that the thirty-third section was intended to prevent a few dissentient stockholders, as here, from setting up their wills against the will of a large majority, and the statute should be so construed as to further that object."

A liberal, and not a narrow, construction must therefore be given to the language of the twenty-seventh and twenty-ninth

sections of the act of 1896, in order to give effect to the intent of the legislature manifested in this broad and comprehensive grant of authority to retire shares of stock.

The directors claim to have taken action under the fourth method of retirement—"by the purchase, at not above par, of certain shares for retirement"—as well as under the act of 1902, hereafter referred to.

In the notice of the meeting, as well as in the proceedings and certificate filed, the mere formalities required by sections 27 and 29 of the act of 1896, as well as those prescribed by the act of 1902, were strictly complied with.

Under this mode of retirement it is optional with the shareholder to sell or retain his stock.

As has been shown, the company may, without the sanction of this provision, purchase its own stock.

The company may purchase in open market or of shareholders, and hold the stock; but, if the purpose is to retire the stock, the provisions of the twenty-seventh and twenty-ninth sections must be complied with, one of which is that the purchase must be for a price not above par.

If purchases are made under this clause it implies, of necessity, a contract between the company and the seller, between one who desires to buy and one who is willing to sell. The word "purchase" is entirely inapplicable to any other condition.

The first two methods are compulsory; the fourth method is not compulsory, else it would not be a purchase.

It cannot, therefore, be held that, in order to give effect to this fourth method, shares must, in fact, be purchased ratably from each stockholder, and that one dissentient, although all others accept, may deprive the company of the benefit of this method, and render the legislative act to that extent abortive.

Equality and the equitable right of shareholders to uniform treatment is preserved by giving the like option to all.

It is insisted, on behalf of the complainant, that the resolution of the directors does not, within the meaning of the twenty-ninth section, provide for the purchase of certain shares for retirement. The alleged infirmity is that the transaction under

review is not substantially "the purchase of certain shares;" that the amount of the decrease and the number of shares which may be purchased, if the scheme is permitted to be acted upon, will be uncertain.

The resolution declares that the directors desire to retire two million preferred shares, and that to the extent that holders thereof shall consent thereto, that number of shares will be retired out of bonds or the proceeds of bonds.

The words "certain shares" cannot be construed to mean that particular shares shall be designated, or that the names of the holders thereof shall be specified; that would give the majority power to make an unjust discrimination, by selection against the minority who might desire to accept the bonds, and cannot reasonably be deemed to have been the legislative intent.

The resolution could do no more than declare what number of shares the company desired to retire, and if the failure to acquire by purchase the whole number rendered the undertaking futile, the two-thirds of assenting stockholders could be deprived of the right given them by the statute to retire by purchase, by the act of a single dissentient. It would manifestly be in contravention of the purpose of the statute to construe it in that way, and would practically strike out of the twenty-ninth section one of the modes prescribed for retiring the stock.

The Corporation act gives express power to retire shares by purchase, and that provision must be read into the certificate of incorporation, under and subject to which the complainant holds her stock. It cannot, therefore, be even plausibly maintained that shares cannot be purchased for retirement by cash.

But it is contended that the appellant is without authority to issue bonds with which, or with the proceeds thereof, it purposes to effect the purchase.

There is no provision in the Corporation act, or in the charter of the company, to support the proposition that purchases of its stock cannot be made by it on credit.

On the contrary, as has been shown, the company has power to buy its own shares and that power is given to it in the same terms and as broadly as the granted authority to purchase other

personal property. No limitation is, in this respect, placed upon it which does not apply equally to the purchase of all other property.

The right to purchase carries with it the right to make such terms as to payment as can be agreed upon with the vendor. The company could say to the seller that it would take the stock at the offered price, payable in one week or one month, and it would be a valid transaction; and if a credit of one week or one month could be given, it could be extended at the will of the vendor.

There is a technical meaning given in the law to the word "purchase," as applied to real estate, wider than its general signification; it is the acquisition of lands by other means than descent or inheritance.

As applied to personalty, it is the acquisition of anything for a price, by the payment of money or its equivalent.

Sale and exchange are used interchangeably in the law, and is a transmutation of property from one party to another in consideration of some price or recompense in value.

By the settled rule of interpretation, in the absence of any expression to narrow its significance, the word "purchase" must be given its ordinary well-understood meaning as accepted in the daily transactions of the business world, and that carries the right to buy for cash, for any equivalent agreed upon, or on the credit of the buyer. The right to buy on credit must necessarily include the right of the purchaser to give the vendor evidence of the credit, by note, or bond, or other way agreed upon, as well as the right of the purchaser to pledge his credit, by note or bond, to a third person, and thereby secure the cash to pay the vendor.

The right to create a debt also carries with it the right to secure it, by mortgage or otherwise, in the absence of any statutory restraint upon the corporation.

Such right was maintained by Chancellor Green in *Magie v. Evangelical Dutch Church, 2 Beas. 77*, and affirmed in this court, *2 McCart. 500*.

, The amended certificate of incorporation, after specifying the various branches of business in which it may engage, has the following provision:

"Without in any particular limiting any of the objects and powers of the corporation, it is hereby expressly declared and provided that the corporation shall have power to issue bonds and other obligations in payment for property purchased or acquired by it or for any other object in or about its business; to mortgage or pledge any stocks, bonds or other obligations or any property which may be acquired by it to secure any bonds or other obligations by it issued or incurred; to guarantee any dividends or bonds or contracts or other obligations; to make and perform contracts of any kind and description; and in carrying on its business, or for the purpose of attaining or furthering any of its objects, to do any and all other acts and things, and to exercise any and all other powers which a copartnership or natural person could do and exercise, and which now or heretofore may be authorized by law."

Here is expressly provided the right to mortgage all property then held, or thereafter acquired, not only for debts contracted in carrying on its various branches of business, but also for the purpose of attaining or furthering any of its objects.

One of the purposes and objects of the corporation, which was contemplated in its inception and provided for by the act of 1896, and which is now entered upon and which, in the estimation of the requisite number of shareholders, will be productive of beneficial results, is the retirement of the proposed number of shares by purchase. The object is a lawful one, being expressly recognized by the Corporation act.

The first section of the Corporation act gives corporations organized under it power to mortgage their real and personal estate and franchises.

This provision must be regarded as part of the charter of the company, and thereby, with the added provisions of the certificate of incorporation, the directors are invested with the most comprehensive authority to issue bonds secured by mortgage for any and all legitimate purposes and objects of the company, good faith being exercised.

That being so, it logically follows that these bonds may be sold on the market and stock purchased, according to the resolution, with the proceeds, or the company may offer the bonds

to all stockholders, on same terms, who are willing to accept them.

That would be a purchase of shares by something of equal value in the estimation of those who elect to sell.

| The fact that those who do not accept will have an additional mortgage debt underlying their stock, impairs no vested right. |

They acquired their shares subject to the provisions of the act of 1896 and the certificates of incorporation, which authorize the retirement of stock in the manner adopted. It is immaterial to stockholders who do not assent whether bonds are secured by ·mortgage. All pecuniary obligations of the company underlie the shares of preferred stock. It concerns only the unsecured creditors and those who accept the bonds.

In the opinion of the court below the proposed plan is condemned on the ground "that it is a preferential distribution of capital among some of the shareholders to the exclusion of others, and not a plan for an equal ratable distribution among all the preferred stockholders; that the capital represented by preferred stock, up to a limit of $200,000,000, is to be reduced to the extent the holders agree to take bonds, and the distribution of the amount released is made solely among those who consent to take bonds. The stock of all those who decline to take bonds is thus made subject to the prior claim and lien of those who take bonds."

That this plan involves a reduction of capital stock is conceded; it is the very purpose of the plan to reduce it and retire it; but to the assertion that it is preferential I am unable to assent.

The same opportunity is given to all to accept the offer— none are excluded—and the complainant, who has declined the offer, cannot say to the ninety and nine who have elected to accept it that they have been preferred. There has been no act of preference on the part of the corporation; the position occupied by the complainant is of her own option.

A like charge could be made if the purchase for retirement was to be for cash.

In that case, if the complainant refused to sell, the cash assets of the company would be distributed among others who elected

.to sell, and could, with equal propriety, be termed a preferential distribution. If, for this reason, the execution of the plan can be arrested, then, although the statute confers express power to retire by purchase, two-thirds of the shareholders assenting, still the retirement by purchase cannot be made if there is a single dissentient.

The first two methods provided for retiring the stock are compulsory, and, if the company had cash assets to retire in those methods, the further provision for retirement by purchase would be unnecessary, if it could be by the payment of cash only. The inference is that the draftsman of the twenty-ninth section in-. tended to bestow the power to purchase on credit, cash assets not being in hand.

Whether the purchase is for cash or through mortgage bonds, it is obvious that the shares of dissentients will be subject to proportionately greater burdens than would fall upon them if no shares were retired.

When cash is paid to those who sell forty per cent. of their holdings, the assets of the company are reduced to that extent— forty per cent.—but the indebtedness of the company remains, as before.

The result is that the indebtedness of the company, with forty per cent. of cash withdrawn, in effect, would be relatively greater as to the dissentient stockholder than it would be as to those who retained only sixty per cent. of their stock, with cash in hand for the forty per cent. surrendered; in the language of the dissentients, it would be a readjustment of the relation between the shareholders, to the disadvantage of those who did not elect to sell. The same condition would arise in the case of purchase on credit, and it may be to a greater extent, but the principle is the same, and if illegal in the latter case, it could not be defended in the former.

The sufficient answer to all these objections is that the scheme adopted is within the purview of the Corporation act of 1896 and of the certificate of incorporation, of which the act, in contemplation of law, is part, and the complainant holds her shares subject thereto, and to all the consequences which flow from it.

If, on this branch of the case, it had been concluded that, in

some material respect, the provision of the act of 1896 had not been pursued, the act of 1902, which has been strictly followed, is valid and constitutional.

It is assailed upon two grounds, either of which, if well taken, would render it obnoxious to the organic law.

The act of 1902 provides that, with the consent of two-thirds in interest of each class of the stockholders present, in person or by proxy, at a meeting called in the manner provided in section 27, every corporation organized under this act which shall have issued preferred stock—

(1) Entitling the holders thereof to receive dividends at a rate exceeding five per centum per annum.

(2) Shall have continuously declared and paid dividends at such rate on such preferred stock for the period of at least one year next preceding the meeting.

(3) Whose floating or unfunded debt at the time of the stockholders' meeting shall, in the certificate thereof filed with the secretary of state, be certified not to exceed ten per centum of the par amount of the preferred stock then outstanding.

(4) Whose assets at such time, after deducting the amount of its indebtedness, shall be certified, in the judgment of the officers making such certificate, to be at least equal to the amount of preferred stock issued and outstanding, may, with the consent of the holder of any such preferred stock, redeem and retire the preferred stock of such holder, out of the bonds, or out of the proceeds of bonds, of the corporation, bearing interest at a rate not exceeding five per centum per annum, the principal of such bonds being made payable at a date not less than ten years from the date thereof; every corporation organized under this act may, from time to time, in the manner above provided, issue bonds, which, if thereon so declared, shall be convertible at par, at the option of the holder, into fully-paid common stock of the corporation at par, within any period therein prescribed, not less than two years from the issue thereof; and, in such case, the board of directors may authorize the issue of common stock, into which such bonds, by their terms, shall be convertible.

*First.* Is this act special?

In considering this question it must be observed—

(1) That every corporation, under the act of 1896, has power to issue preferred stock at a rate of dividend exceeding five per cent.

(2) That every corporation may, if successfully operated, be able to declare and pay dividends at such rate on the preferred stock continuously for one year next before the provisions of this act are availed of.

(3) Every corporation may be able to keep its floating or unfunded debt within the prescribed limit.

(4) Every corporation not only may, but should be required to be in such sound financial condition as to be able, through the designated officers, truthfully to certify that its assets, after deducting the amount of its indebtedness, are at least equal to the amount of preferred stock issued and outstanding.

Each and every of these conditions, upon which the existence of the right to act under this statute depends, applies to all corporations; no discrimination is made in respect to the amount of capital stock or otherwise.

Whether its aid can be invoked is left, by the legislature, to depend wholly upon its solvency and upon the skill, good management and success with which the business of the corporation is conducted. Equal opportunity is guaranteed to all; no right is accorded to one which is denied to another.

It is a misconception to suppose that it creates a class; it applies alike to all corporations; it is general in its operation and effect, requiring the existence of conditions which all corporations have equal opportunity, under the law, to conform to, and to which all may attain.

Whether these several provisions, or any of them, are wise or unwise, or whether the method provided for certifying to the existence of these conditions is a satisfactory and judicious one, is not a legitimate subject for judicial inquiry.

·It is within the discretion of the legislature alone to prescribe the conditions upon which privileges and powers shall be exercised by corporations, and what shall constitute sufficient evidence of their right to do so, so long as no provision of the fundamental law is violated.

The assertion that this law is unwise and that these conditions do not constitute, within legislative discretion, a reasonable basis for the enactment, will not be assented to when it is considered—

(1) That the officers who make the certificate are in a position to have full knowledge of the financial *status* of their company; that their certificate is not conclusive evidence, but may be shown to be false and action in pursuance of it arrested.

(2) That the other conditions prescribed in the act of 1902 will prevent a corporation which may be in an unsound condition from converting its preferred stock into mortgage bonds, and thereby give the holders of such shares a priority over the floating or unsecured debts.

(3) That while, under the Corporation act of 1896, every corporation which had issued preferred stock might, by purchase of shares, convert its preferred stock into bonds, without regard to whether or not it was in the sound financial condition contemplated by the act of 1902, the act of 1902 is a restraining and not an enlarging act. It provides the conditions upon which preferred stock may be purchased and retired by mortgage bonds, and thereby excludes the adoption of any other method; *expressio unius exclusio alterius*. The prescribed conditions must exist to render the retirement by purchase of shares lawful.

(4) That a due observance of the provisions of the act of 1092 will be an assurance to those who may be induced to purchase the bonds that they have a substantial basis as an investment.

The case of *Grey, Attorney-General,* v. *Newark Plank Road Co., 36 Vr. 51* (affirmed by this court, *36 Vr. 603,* so far as the question now involved is concerned), is relied upon by the complainant to specialize the act of 1902.

It needs no discussion to show that it is without pertinence.

The Plank Road act expressly limited its provisions to the following corporations:

(1) Those theretofore organized under any special act of the legislature.

(2) And which have been empowered, by any supplement, to lay railroad tracks and operate a horse railroad.

(3) Whose time limited for commencing and completing the building of such railroad has expired.

It, in terms, excluded all corporations which, at the time the act was passed—in 1889—were without these three character-istics, and could not apply to any future corporation.

*Second.* Does the act of 1902 impair any vested right of the complainant?

Section 6 of the "Act concerning corporations," passed in 1846 (*P. L. of 1846 p. 17*), provided

"that the charter of every corporation which shall hereafter be granted by the legislature, shall be subject to alteration, suspension and repeal, in the discretion of the legislature."

It must be conceded that it is firmly settled in our jurispru-dence that the right reserved in this sixth section to amend, alter or repeal charters extends only to the modification or destruc-tion of rights as between the state and the corporation, but that the rights of the stockholders *inter sese* can in no respect be impaired, except in so far as impairment may result from an alteration required by the public interest. *Kean* v. *Johnson, 1 Stock. 401; Zabriskie* v. *Hackensack, 3 C. E. Gr. 178,* and *Mills* v. *Central Railroad Co., 14 Stew. Eq. 1,* are cases under the act of 1846, and the *Newark Library Case, 35 Vr. 217, 265,* dealt with the right of amendment and repeal under the act of 1846.

The act of 1896, under which the appellant is incorporated, by its fourth section, re-enacted the sixth section of the act of 1846, and also provides, in its fifth section, as follows:

"This act may be amended or repealed, at the pleasure of the legisla-ture, and every corporation created under this act shall be bound by such amendment; but such amendment or repeal shall not take away or im-pair any remedy against any such corporation or its officers for any lia-bility which shall have been previously incurred; this act and all amend-ments thereof shall be a part of the charter of every corporation hereto-fore or hereafter formed hereunder, except so far as the same are inap-plicable and inappropriate to the objects of such corporation."

This section was first enacted in the revision of the Corpora-tion act of 1896, and it must have been designed to amplify and

enlarge the power of the legislature over corporations organized under it.

Under the provision contained in the sixth section of the act of 1846, retained in the revision of 1896, it had been repeatedly held that the power was fully reserved to alter or repeal charters for the benefit of the public.

The language of the fifth section of the act of 1896 is very broad: "This act and all amendments thereof shall be a part of the charter of every corporation heretofore or hereafter formed under it."

It is difficult to perceive how any substantial force can be accorded to it, unless some amendment may be made which may affect the rights of stockholders *inter sese* to some extent.

In *Andrews* v. *Gas Meter Co., L. R. 1 Ch. 361 (1897)*, the defendant company was formed and registered as a limited company under the English Companies' act of 1856, but in October, 1862, it was registered under the Companies' act of 1862.

On appeal, the English court held that the case was to be determined by the act of 1862, and that a limited company, having no authority, under its memorandum or articles, to create any preference between different classes of shares, may, by special resolution passed under powers conferred by the Companies' act of 1862, sections 50 and 51, alter its articles so as to authorize directors to issue preference shares by way of increase of capital.

In *Allen* v. *Gold Reefs of West Africa (Limited), L. R. 1 Ch. 656 (1900)*, a limited company, by one of its articles, provided that it should have a lien for all debts and liabilities of any member to the company "upon all shares (not being fully paid) held by such member."

The company, by way of purchase-money for the property acquired by it, allotted fully-paid shares to Z., a nominee of the vendor to the company; Z. also applied for and had allotted to him shares not paid up. He was the only holder of fully-paid-up shares.

At his death he was indebted to the company in arrears of calls on the unpaid shares, but his assets were insufficient to pay the arrears. Thereupon the company, by special resolution, under section 50 of the Companies' act of 1862, altered the above

article by omitting therefrom the words "not being fully paid," thus creating a lien on Z.'s fully-paid shares.

The English court of appeals, also, in this case ruled that the company had power to alter its articles by extending its lien to fully-paid shares, since he took them subject to the original articles, and the power of altering them given to the company by section 50.

The judgment of the appellate court in these very recent cases was delivered after an exhaustive review of the previous decisions.

While these cases are not controlling in this forum, they are instructive, as the declarations of very learned judges, exercising broad equity power, that the original articles of the company do not constitute such a fast-bound contract, between the shareholders *inter sese,* as to create vested rights which could not be unfavorably affected by an alteration of the articles in pursuance of the power given by section 50 of the Companies' act of 1862.

The case of *Schwarzwaelder* v. *German Mutual Fire Insurance Co., 14 Dick. Ch. Rep. 589,* decided in this court in 1899, has a more important bearing.

The defendant was a mutual insurance company organized, in 1893, under our general act concerning insurance companies. The complainant became a member of the company in 1898. An act was passed March 6th, 1899 (*P. L. of 1889 p. 17*), authorizing mutual insurance companies to be changed into joint stock companies.

This court held that, under this act of 1899, a mutual insurance company organized in 1893 cannot transform itself into a joint stock company against the will of a member who acquired membership by contract with the company made before the passage of the act of 1899. The rule adopted in *Kean* v. *Johnson, supra,* was properly adhered to. In reading the opinion of Mr. Justice Dixon it cannot escape attention that it was not even suggested that if the company had been organized after the passage of the act of 1899 the transformation could have been successfully assailed for illegality.

The only substantial difference between this case and the one *sub judice* is that the Insurance act of 1899 expressly declares

what alteration the company shall have competency to make, while, under the General Corporation act of 1896, there is a general grant of power to make alterations, without words of limitation, and the provision is declared to be part of the charter of every corporation organized under it.

It is unnecessary, however, to determine, in this case, what the true limitation upon the legislative power is; where the boundary line is which cannot be overstepped.

Such a declaration in this case would be *obiter* and unwise. The law upon this subject, which is of great moment, is, as yet, in a formative state; a general rule upon a subject of so wide a range can be implanted in our jurisprudence only by gradual development, as questions arise for adjudication.

Vice in a legislative act cannot safely be predicated upon the mere fact that it may not be unreasonable to apprehend that some depreciation in the value of shares may flow from it. The legislature may impose additional burdens; it may withdraw the right to engage in some remunerative branch of business, and may repeal the entire charter.

Undoubtedly there may be changes so radical that underlying and fundamental principles will not permit the legislature to reserve to itself a right to make them.

It is not intended to express an opinion as to the effect of the fifth section of the act of 1896 upon this question of vested rights, and it will be dealt with as if there was no authority for the act of 1902, other than that contained in section 4 of the act of 1896, and the case of *Kean* v. *Johnson, supra,* will be accepted as a proper exposition of the law.

The act of 1896 gave the appellant the right, by a two-thirds vote of its shareholders, to retire preferred stock by purchase; the act of 1902 preserves that right, merely regulating the manner in which it should be exercised. As before stated, the complainant held her stock subject to the right of the company to retire, by purchase, the shares of such stockholders as might desire to sell, and the act of 1902 in no respect alters or changes her position, except to make it more secure when the given option is refused by her. No right which vested under the Corporation act of 1896 is impaired or taken away by the later statute.

Berger *v.* U. S. Steel Corporation.

But if it did, in some appreciable degree, injuriously affect the value of complainant's shares, still this act must be upheld, under the authority of *Kean* v. *Johnson, supra.*

That case holds that where the public interest is concerned, where public policy will be promoted, legislative interference, by an alteration of the law, is within the reserved power in section 4.

The fact that the act of 1902 excludes all other methods for retiring shares by purchase, and the provision that it cannot be applied unless it is made to appear that the assets, after deducting the amount of its indebtedness, at least equals the amount of preferred stock outstanding, is in the public interest, for the protection of creditors and those who might be induced to purchase the bonds issued to retire the preferred stock.

It is obvious that if the assets, after deducting debts, did not equal the preferred shares, immediately upon the conversion the debts of the company would exceed its assets and the shareholders would not only be made creditors, but would be preferred to the creditors at large. The other provisions in this respect are some assurance that the required financial soundness, existing at the time of the purchase for retirement, will be maintained.

If, previous to the passage of the act of 1902, the company had undertaken to retire its shares by purchase, being in a financial condition which would imperil the claims of unsecured creditors, equity, which is ever solicitous for the rights of creditors, would have intervened to prevent such conversion.

The act of 1902, if observed, is a barrier to a like attempt.

It is not necessary to discuss the validity of the provision of the act of 1902, "that two-thirds in interest of each class of the stockholders, present in person or by proxy, may authorize the retirement of shares," which is a departure from the act of 1896.

If that provision is inimical to the supreme law, it is well settled, in this court, that it does not taint the entire act; it may be rejected, and the remainder of the act will stand, subject to be availed of when the proposed retirement receives the vote of shareholders required by section 27 of the act of 1896, which it did receive in this case.

Lastly, it is urged that the manner in which the conversion plan is to be carried through and consummated is illegal, and furnishes sufficient ground for retaining the injunction.

"Individual stockholders cannot question, in judicial proceedings, corporate acts of directors if the same are within the powers of the corporation and in furtherance of its purposes, are not unlawful or against good morals and are done in good faith and in the exercise of an honest judgment." *Ellerman* v. *Chicago Junction Co., 4 Dick. Ch. Rep. 217.*

To the same effect are the cases of *Benedict* v. *Columbus Construction Co., 4 Dick. Ch. Rep. 23; Edison* v. *Edison, 7 Dick. Ch. Rep. 620.*

The action challenged in the case *sub judice* is that of the directors, fortified and upheld by the approving vote of more than two-thirds of the shareholders.

The plan was adopted by the requisite vote, with full knowledge of its purport, communicated in the circular-letter accompanying the call of the stockholders' meeting, and therefore, in the absence of fraud, it is not the province of this court to substitute its judgment for that of the directors and shareholders, and declare that a less expensive or more beneficial plan could have been resorted to successfully. Nor can any feature of the plan, expressly authorized by the by-laws, adopted before the complainant became a shareholder, be the subject of judicial control, so long as it is not inimical to any constitutional mandate, the end to be attained being, as in this case, duly authorized by law.

The means adopted to acquire the benefit of the authorized retirement became part of the business of the company, with which this court can interfere to no greater extent than it can with other lawful corporate transactions.

The decree of the court of chancery should be reversed and the injunction dissolved, with costs in this court and in the court below.

*For reversal*—THE CHIEF-JUSTICE, VAN SYCKEL, COLLINS, FORT, GARRETSON, HENDRICKSON, BOGERT, VROOM—8.

*For affirmance*—GARRISON, PITNEY, VOORHEES—3.