## In re SHAROOD SHOE CORPORATION.

## In re LINDEKE, WARNER & SONS.

### (District Court, D. Minnesota, Third Division. January 17, 1912.)

1. CORPORATIONS (§ 243*)—LIABILITY OF STOCKHOLDERS—SUBSCRIPTIONS—VA-LIDITY—LACHES.

A party to a stock subscription agreement, entered into by several persons on condition that it should be binding only when a specified sum should be subscribed, has lost by laches his right to claim a rescission after bankruptcy of the corporation on the ground that the full sum was not subscribed, where he paid for and received his agreed share of the stock, and continued as a stockholder until such bankruptcy without inquiring whether the full subscription had been obtained.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 943; Dec. Dig. § 243.*]

2. CORPORATIONS (§ 40*)—ARTICLES OF INCORPORATION—AMENDMENT—CONSENT OF STOCKHOLDERS.

One becoming a stockholder in a Minnesota corporation impliedly assents to any subsequent amendment of the articles of incorporation not fundamental, but designed to enable the corporation to conduct its authorized business more beneficially.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 124; Dec. Dig. § 40.*]

3. CORPORATIONS (§ 40*)—ARTICLES OF INCORPORATION—AMENDMENT—CONSENT OF STOCKHOLDERS.

Under Gen. St. Minn. 1894, §§ 2803, 2807, 3415, authorizing amendment of corporate articles on majority vote of the stock, an amendment of the articles of a manufacturing corporation adopted by such majority, authorizing an agreement whereby lenders of money should receive preferred stock possessing the sole voting power and control of the corporation until repayment in full, is valid, though all the existing stockholders did not assent to it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 124; Dec. Dig. § 40.*]

4. CORPORATIONS (§ 40*)—ARTICLES OF INCORPORATION—AMENDMENT—OBJECTIONS—LACHES.

Stockholders, who do not vote for an amendment authorizing issuance of preferred stock carrying with it control of the corporation, have lost by laches the right after bankruptcy of the corporation, to deny validity of the amendment, where they permitted stock to be issued and the holders to assume control without objection.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 124; Dec. Dig. § 40.*]

5. CORPORATIONS (§ 40*)—ARTICLES OF INCORPORATION—AMENDMENT—OBJECTIONS.

Holders of preferred stock securing loans cannot deny the validity of an amendment, adopted under a statute authorizing amendment on vote of a majority of the stock, because all of the stockholders did not assent to the amendment, where it was not agreed that the amendment should be adopted by unanimous vote, and where control of the corporation was taken under the amendment and maintained until bankruptcy of the corporation, without objection.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 40.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. CORPORATIONS (§ 76*)—STOCK SUBSCRIPTION AGREEMENT—RIGHT TO RESCIND—MISTAKE OF LAW.

A mistake of law furnishes no ground for rescission of a stock subscription agreement.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 76.*]

In the matter of the Sharood Shoe Corporation, bankrupt. On review of an order disallowing a claim of Lindeke, Warner & Sons. Affirmed.

Lightner & Young, for trustee.
M. D. Munn, for claimant.

WILLARD, District Judge. This is a review of an order made by the referee on October 14, 1911, disallowing the claim of Lindeke, Warner & Sons.

Some time in August, 1910, Lindeke, Warner & Sons with others signed the following agreement:

"The undersigned agree with each other to loan to the Sharood Shoe Corporation the sums of moneys set opposite their respective signatures, on the following terms:

"Said loans shall bear interest at six per cent. per annum and shall be payable on or before six months.

"In the payment of such loans there shall be no preference between the undersigned and when any payment is made on said loan, a pro rata payment shall be made to each of the undersigned.

"It is understood that the articles of incorporation of said corporation shall be amended so as to provide for at least one hundred and fifty thousand dollars ($150,000) of a new first preferred stock, which shall be made payable in full with dividends before any payment is made upon any other stock of said corporation, and which shall have the sole voting power and control of the company until it is paid off in full with accumulated dividends equal to six per cent. per annum, and it is agreed between the undersigned that when said articles have been so amended, they will take the amount set opposite their signatures of said stock and that the loan hereby made shall be used in payment of said stock.

"This agreement shall be binding when the amount agreed to be paid as aforesaid amounts to one hundred and fifty thousand dollars ($150,000).

"Dated, St. Paul, Minnesota, August 31, 1910."

Lindeke, Warner & Sons subscribed $3,750. About December 15, 1910, first preferred stock to the amount of $3,750 was, in accordance with the terms of the subscription, delivered to and accepted by Lindeke, Warner & Sons. The Sharood Shoe Corporation was adjudicated a bankrupt on February 7, 1911. Lindeke, Warner & Sons presented a petition to the referee claiming that the stock was for several reasons set out in the petition illegally issued, offering to surrender it, and asking to be allowed to prove a claim for $3,750. That petition was denied by the referee.

1. It is claimed by the petitioner that its subscription to the agreement above set out was procured by false representations, and that it is entitled to rescind on that ground. This contention cannot be sustained. The case lacks almost all of the requisites of an action to set aside a contract on the ground of fraud.

[1] 2. The petitioner further claims that its subscription was not

binding upon it, because the full sum of $150,000 was not subscribed. The facts are that over $181,000 was subscribed; but of this something over $30,000 was subscribed by merchandise creditors who made no loan of cash to the company, but surrendered their claims and received stock in lieu thereof. The subscription paper which the petitioner signed was signed by persons who agreed to take $150,000 worth of stock; but it was proven that the subscription of John P. Upham to the amount of $10,000 was not to be paid in cash, but was to be applied in liquidation to that extent of a debt owing from the corporation to him. Another subscription, that of C. K. Sharood for $10,000, did not represent any actual cash advanced to the shoe corporation. The First National Bank of St. Paul, holding notes against the corporation, surrendered one note for $10,000 to Sharood, and that was used by him in paying for his subscription. The remainder of the $150,000, to wit, $130,000, was actually paid in cash.

The theory of the petitioner is that the entire amount was to be advanced in cash, and that, only $130,000 having been so advanced, its subscription was not binding upon it.

It is not necessary to decide whether by reason of these facts the petitioner could have successfully resisted a suit brought against it to enforce its subscription. Instead of waiting for such a suit, it voluntarily paid to the company $3,750 from time to time as called for. The first payment of $1,000 was made on September 17, 1910, and, as far as now appears, without any inquiry on the part of the petitioner as to whether the full amount had been subscribed or not, although A. W. Lindeke testified that he was verbally told before that by Mr. Mitchell or others that it had all been subscribed. Before the second payment which was made on September 30th, the petitioner received a letter containing a list of subscribers; but there was nothing on the list which indicated that Upham's subscription or Sharood's differed in any respect from the others. Mr. Lindeke testified that he would not have paid any part of his company's subscription had he known the facts in regard to the subscriptions of Upham and Sharood. It is difficult, however, to believe this. He testified as follows (page 25):

"Q. Did you at any of the meetings state in effect that you had rather lose the money you subscribed to this than to have the Sharood Shoe Corporation fail at that time? A. I don't remember.

"Q. Do you think you might have said that? A. I was very much interested in preserving the assets and continuing the business, but I don't remember saying anything like that.

"Q. You wouldn't state that you didn't say so? A. If I did, it was done largely in influencing some of the other business men to co-operate with us in furnishing additional capital."

And again on page 29:

"Q. Was it the desire of yourself as well as the other men present to have this business continued as one of the industries of the city? A. Yes, sir; certainly.

"Q. That was the main object you had in helping it? A. Yes, sir.

"Q. That was the only object you had? A. Yes."

The preponderance of the evidence would require a finding that his company would have paid the amount of the subscription, even had it known of the facts connected with the transaction.

Moreover, after paying the entire amount as called for, a certificate of stock was issued to the company, it accepted it, surrendered the notes previously given, and continued as a stockholder until the bankruptcy. During that time it made no attempt to ascertain the facts in regard to the subscription. This could easily have been done. If it desired to rescind the contract on the ground that the entire amount was not subscribed, it should have moved more promptly. It is now too late to rely upon that as a ground for rescission.

[2, 3] 3. The principal contention on the part of the petitioner is that the amendment contemplated in the subscription contract, and which was afterwards made, was illegally adopted, and that stock issued in pursuance of that amendment was wrongfully issued.

No claim is made that the requirements of the Minnesota statutes in regard to amendment of articles of incorporation were not strictly followed; but it is insisted that there was no power under those statutes to amend the articles as the subscription contract provided, and that new stock could only be legally issued with the consent of all the then existing stockholders.

The capital stock provided for in the original articles of incorporation was $750,000, divided into 10,000 shares of preferred stock, and 5,000 shares of common stock; each share of stock being of the par value of $50. By the terms of these articles the preferred stock was entitled to receive an annual cumulative dividend of 7 per cent., and in case of liquidation, to be paid in full both the principal and accrued dividends, before any amount should be paid to the holders of the common stock. The preferred stockholders were not entitled to vote, except after a default in payment of the dividends upon their stock, and that power to vote continued only so long as the default continued.

Of the stock originally provided for there had been issued prior to September 28, 1910, 8,690 of the preferred stock and 1,680 shares of the common stock. There were therefore 4,630 shares undisposed of at the time the amendment was adopted on the last-named date. This amendment did not increase the capital stock of the corporation, nor the number of its shares. It did, however, rearrange the shares so as to provide that there should be 4,000 of first preferred stock, 2,000 of common stock, and 9,000 of preferred stock, and in the 9,000 of preferred stock should be included all of the preferred stock outstanding.

At the meeting at which this amendment was adopted, there were represented 6,635 shares of the preferred stock and 1,595 shares of the common stock. Three-fourths of all the preferred stock outstanding and three-fourths of all the common stock outstanding voted for the amendment. The amendment complied with the terms of the subscription agreement, and gave the first preferred stock the rights therein specified.

In order to determine the legality of this amendment, it is neces-
sary to consider the statutes of Minnesota relating to the amendment
of articles of incorporation.

The Sharood Shoe Corporation was organized in 1905. Section
2807 of the General Statutes of Minnesota of 1894 provided that:

"The purpose for which every such corporation shall be established shall
be distinctly and definitely specified by the stockholders in their articles of
association, and it shall not be lawful for said corporation to direct its op-
erations or appropriate its funds to any other purpose: Provided, that such
articles of association may be amended in any respect which might have
been lawfully made a part of such original articles, at any meetings of such
stockholders, by a majority vote of all the shares of stock represented in such
corporation, upon giving notice of a meeting of such stockholders to be held
for the purpose of making such change, in the same manner as provided in
section four of this act for the first meeting of the corporation, except that
notice of change shall not be waived as therein provided. Proof of the pub-
lication of such notice and change, made by filing the affidavit of the pub-
lisher, and a certified copy of the proceedings making such change, shall be
filed in the office of the secretary of state, in the same manner as provided
for the filing of the articles of incorporation of such association therein:
Provided, that whenever, after the adoption, filing, and publication of the
articles of association, and the making and recording of the certificate pro-
vided for by this act, and the creation thereby of a body corporate, the said
corporation shall resolve to alter, modify, or change any of its articles of
association, such corporation may, by resolution duly passed at any regular
meeting of the stockholders thereof, adopt a new article or articles altering,
modifying, or changing any of the original articles: Provided, further, that
no such new or amended articles shall change the general nature of its busi-
ness, or be operative or valid to alter, modify, or change such original articles,
until the same shall be published and the certificate of the purposes for
which said corporation is formed as set forth in such new or amended articles,
in the same manner and with the like formalities that the original articles
are now required to be published and the certificate thereof recorded; and
when so adopted, published, and the certificate aforesaid recorded, the said
amended articles shall be substituted for and take the place of the original
articles so amended."

Section 2803 of the same statutes provides as follows:

"The shareholders or stockholders in any body politic or corporate which
has been or hereafter may be incorporated pursuant to the provisions of title
two of chapter thirty-four of the General Statutes of this state, may amend
the articles of association of such body corporate in any respect which might
have been lawfully made a part of such original articles, by adopting, by a
majority vote in number and amount of such shareholders and shares, articles
specifying such amendments."

Section 3415 of the same statutes provides as follows:

"Corporations having capital stock divided into shares, unless specially au-
thorized, shall not issue any shares for a less amount to be actually paid in
on each share than the par value of the shares first issued: Provided, that
railroad and navigation and manufacturing corporations, and corporations
for buying, holding, improving, selling, and dealing in lands, tenements,
hereditaments, real, mixed, and personal estate and property, created or
organized under this chapter, or under any charter or special act of incor-
poration heretofore passed, shall have power to create, issue and dispose
of such an amount of special, preferred or full-paid stock of the capital
stock of such corporation as may be deemed advisable by the board of di-
rectors of such corporation. Provided, that any corporation may, by its
articles of incorporation or by any amended article of its articles of incor-
poration, provide for special, preferred and common stock, or special or

preferred and common stock, of the capital stock of such corporation; and any corporation heretofore or hereafter organized without changing its articles of incorporation may issue its capital stock as a part special and a part preferred and a part common, or a part common and a part either special or preferred, by direction of its board of directors, when so authorized by a majority of its stockholders at its annual meeting or at a meeting called for that purpose; and said board of directors, when so authorized by said meeting of said stockholders, may give such preference as it may deem best to such special or preferred stock, or such special and preferred stock."

It is claimed by the trustee that these provisions of the Minnesota statutes authorized the amendment which was adopted, and that that amendment was binding upon those shareholders who did not assent to it.

The power of a majority of the shareholders in a corporation to amend its articles has been considered by the Supreme Court of Minnesota. In Mercantile Statement Company v. Kneal, 51 Minn. 263, on page 265, 53 N. W. 632, the court said:

"The pertinent inquiry, then, is whether the change was permissible, under the statutes authorizing the creation and regulating the management of corporate bodies. By the provisions found in chapter 34, supra, section 4 of title 1, and section 110 of title 2, the plaintiff was expressly authorized to amend the article in which was set out and stated the nature of its business as fully and to the same extent that it could have amended any other article; while by the terms of section 118, tit. 2, it was given power, by a majority vote in number and amount of its shareholders and shares, to amend any of its articles of incorporation 'in any respect which might have been lawfully made a part of' the original. The lawmakers expressed themselves rather awkwardly when using the words last quoted, but from the language it is obvious that if the proposed amendment was germane to the subject-matter of the article on which it was to be ingrafted, and could have been lawfully incorporated into the original articles of association, there was no obstacle in the way of its adoption by a majority of the shareholders, both numbers and amount or value of the shares held to be considered. Thus adopted, it became a part of the articles under which the business of the plaintiff was conducted. No argument is necessary to show that the change in question, of which appellant complains, was within the spirit and the letter of the statute, and no point can well be made as to the regularity of the manner in which the amendment was voted and adopted."

In Mower v. Staples, 32 Minn. 284, on page 286, 20 N. W. 225, the court said:

"Without exception, so far as we have been able to discover, the courts, and, with a single exception, the text-writers, are agreed that alterations in a charter which are not 'fundamental,' and are authorized by the Legislature, may be effectually accepted by a majority of the stockholders. By a majority of stockholders we understand a majority per capita, when the right to vote is per capita, and a majority of stock, where, as in the present instance, each share of stock is entitled to one vote. Alterations which materially change the nature and purposes of the corporation are fundamental, while those which work no such material change are not fundamental. * * *

"The principle upon which these cases appear to go is that alterations, or, as they are sometimes called, amendments, which do not change the nature, purpose, or character of a corporation or its enterprise, but which are designed to enable the corporation to conduct its authorized business with greater facility, more beneficially, or more wisely. are auxiliary to the original object, and that therefore, when one becomes a stockholder, he impliedly assents that such alterations or amendment may be made."

The case of Wright v. Minn. Life Ins. Co., 193 U. S. 657, on page 663, 24 Sup. Ct. 549, on page 551 (48 L. Ed. 832), related to amendments made in the articles of a Minnesota corporation. It was there said:

"There is much discussion in the authorities as to when a charter amendment is of that fundamental character that a majority of the members or stockholders cannot bind the minority by agreeing to a change in the nature of the business to be carried on or the purposes and objects for which the corporation was created. Each case depends upon its own circumstances, and how far the right of amendment has been impliedly or expressly reserved in the creation of corporate rights. It would be unreasonable and oppressive to require a member or stockholder to remain in a corporation whose fundamental purposes have been changed against his will. On the other hand, where the right of amendment is reserved in the statute or articles of association, it is because the right to make changes which the business may require is recognized, and the exercise of the privilege may be vested in the controlling body of the corporation. In such cases, where there is an exercise of the power in good faith, which does not change the essential character of the business, but authorizes its extension upon a modified plan, both reason and authority·support the corporation in the exercise of the right."

What is the real effect of the amendment in question? So far as giving a preference with reference to dividends and the division of the property upon dissolution is concerned, it is nothing more than a mortgage. The directors of the corporation, without any authority from the shareholders, could have borrowed $150,000 from the subscribers and secured it by a mortgage upon the entire assets of the corporation. That mortgage would have created a lien prior to the existing common and preferred stockholders. The only thing which the amendment does which could not have been done by a mortgage is the taking from the preferred and common stockholders the right to vote.

How can it be said that this amendment materially changed "the nature and purposes of the corporation or of the enterprise for the prosecution of which it was created"? If it worked no such material change, then it was not fundamental. Was it not designed "to enable the corporation to conduct its authorized business * * * more beneficially"? If it was, then the stockholders when they became such impliedly assented that such amendment might be made. Mower v. Staples, 32 Minn. 284, 286, 20 N. W. 225.

Can it not be said that this was in this case an exercise of the power of amendment "in good faith which does not change the essential character of the business, but authorizes its extension upon a modified plan"? Wright v. Minn. Mut. Life Ins. Co., 193 U. S. 657, 664, 24 Sup. Ct. 549, 551 (48 L. Ed. 832). The good faith of the proceedings in the case at bar is not questioned. In August, 1910, the Sharood Shoe Corporation was in serious financial difficulties. It could not meet its maturing paper. The object of the subscription agreement was to save it from bankruptcy. $130,000 of cash was paid to it by the subscribers for that purpose. General creditors surrendered claims against it for over $50,000 and took in lieu thereof shares of the first preferred stock. All of this cash and all of these claims are now a total loss, as the assets are not sufficient to pay the creditors in

full. That the amendment was made with the best of motives is beyond dispute.

It is undoubtedly true that there are cases in which a majority cannot so amend as to deprive one of rights secured by the original articles. Such was the case of Reyes v. The Compania Maritima, 3 Philippine Rep. 519. There the contract creating the society contained an article declaring that five named persons should constitute the first board of directors; that they should hold office for eight years and should each receive as compensation for their services onehalf of one per cent. of the gross income of the company during that time. One year after the organization, a majority of the shareholders, under provisions of the Spanish Code of Commerce similar to those of the Minnesota Statutes, amended·the articles so as to repeal the one constituting the first board of directors. It was held that this was so far invalid as to two of the named directors who objected thereto that they could after the lapse of the eight years recover the stipulated compensation for their services. But no such case is now presented. Here the only thing done by the amendment which could not have been done without it was to deprive for a limited time the other stockholders of the power to vote. It has been held that articles may be so amended, against the objection of a preferred stockholder, as "to change to some extent the relations of the different security holders to each other." Venner v. U. S. Steel Corp. (C. C.) 116 Fed. 1012, 1014.

In Berger v. U. S. Steel Corp., 63 N. J. Eq. 809, at page 825, 53 Atl. 68, at page 74, it was said:

"It is difficult to perceive how any substantial force can be accorded to it, unless some amendment may be made which may affect the rights of stockholders inter sese to some extent."

It is therefore held that the amendment was valid, notwithstanding the fact that all the existing stockholders did not assent to it.

But even upon the assumption that the amendment was at the time it was made unauthorized, there are nevertheless grounds upon which the order of the referee must be affirmed.

Was this first preferred stock absolutely void, or only voidable? If it were absolutely void, then it might be said that the election of the new directors was void, because the persons who elected them were not stockholders, and that all of the acts of the new board were void, including the resolution putting the corporation into bankruptcy.

But the petitioner does not claim, as I understand its contention, that the stock was absolutely void in the sense that the corporation could· under no circumstances have issued it. It seems to be conceded by it that if all the stockholders, preferred and common, had voted for the amendment, it would have been legally adopted, and the stock issued thereunder would have been valid. As far as the state is concerned, the amendment did not authorize the corporation to do anything contrary to the public policy of the state. The contention of the petitioner to the contrary, based upon section 2282 of the Minnesota Statutes of 1894, cannot be sustained. That section clearly makes those stockholders only liable to whom capital stock had been refund-

ed, and then only to the amount so refunded. The amendment made no change in the essential nature of the business of the incorporation. It related entirely to its internal economy. It concerned a matter in which the state had no interest.

In Toledo, St. Louis & Kansas City R. R. v. Continental Trust Company, 95 Fed. 497, on page 531, 36 C. C. A. 155, on page 189, the Circuit Court of Appeals of the Sixth Circuit said:

"The objection that such a preference in the property of the company as is secured by this clause is illegal and unauthorized by law has been again pressed upon us. The same question arose in the case of Hamlin v. Trust Co., 47 U. S. App. 422, 24 C. C. A. 271, 78 Fed. 664. The question was there most ably argued, and was decided upon full consideration. In that case we had under consideration the very preferred shares now in question. We said then that: 'Ordinarily, preferred stock is entitled to no preference over common stock in relation to capital. But when there is an express agreement giving such a preference, not prohibited by local law nor the charter, we see no reason why it is not a valid contract, as between the corporation and such preferred stockholders, and binding upon the common stockholders.' Such an agreement is nothing more than a contract between stockholders as to how they shall divide the corporate property and profits, and, if not prohibited, is clearly within the general powers of such corporators. It is difficult to see how such an arrangement is of the slightest consequence to the public, or to creditors of the corporation. It does not withdraw the property from the demands of creditors, and provides only for the division among those who are the beneficial owners of the corporate property, after the payment of corporate obligations."

The theory that this stock would be voidable and not void is supported by the Minnesota decisions. Olson v. State Bank, 67 Minn. 267, 268, 69 N. W. 904; Palmer v. Bank of Zumbrota, 72 Minn. 266, 277, 75 N. W. 380.

The stock being voidable and not void, who is in a position to attack its validity? As has been seen, the state has no interest in the matter.

It is of course apparent that those common and preferred stockholders who voted for the amendment cannot attack its validity.

[4] Can those common and preferred stockholders who did not vote for the amendment now assert that the stock issued in pursuance thereof is invalid? It is not necessary to decide whether they could by proper proceedings have enjoined its issuance. They did not do so. They allowed the meeting to be held and the amendment to be adopted; they allowed stock to be issued; they allowed the stockholders to elect a new board of directors; they allowed the new board to manage the affairs of the company for several months, and finally to put it into bankruptcy. During all that time they made no objection to the validity of the amendment, and they do not now make any such objection. No common or preferred stockholder now asserts that the first preferred stock is invalid. Under well-recognized principles of law, they have by their laches lost the right to make any such claim. In the case above cited (Toledo, St. Louis & Kansas City R. R. v. Continental Trust Company, 95 Fed. 497, on page 530, 36 C. C. A. 155, on page 189) the court said:

"It is true that this is not a question between creditors and the corporation, or stockholders and third parties. But it is a question between holders of common and holders of preferred stock. If the common stockholders

had an equitable right to have the lien clause in question stricken out, and the contract declared illegal, they should have been prompt in their application to the corporation, or, if it obtained circulation before knowledge, then they should have been prompt in their application to the courts for relief. Mor. Priv. Corp. § 462; Banigan v. Bard, 134 U. S. 291, 10 Sup. Ct. 565 [33 L. Ed. 932]; Kent v. Mining Co., 78 N. Y. 159–187 et seq.; Taylor v. Railroad Co. [C. C.] 13 Fed. 152. This they should have done, so that evil should not fall upon innocent parties who might buy such shares in reliance upon this clause. This they did not do, and only complained when the distribution of the company's property was about to occur. The evidence of acquiescence and ratification afforded by such inexcusable delay is an answer to the objection now made to the performance claimed, aside from all other questions we have considered."

In Hallett v. New England Roller-Grate Co. (C. C.) 105 Fed. 217, on page 223, Judge Putnam, sitting in the Circuit Court, said:

"While the plaintiff's ignorance of the statutes of New Hampshire in April, 1891, is to be excused as a mistake of fact, he was, nevertheless, bound to use some diligence in ascertaining what his relations were to the defendant corporation. Laches, although not so operative at law as in equity, cannot be disregarded when there has been a reasonable possibility of a substantial change in the status during a protracted delay. * * * So far as it refers to cancellations of stock, it ordinarily is applied with reference to the rights of creditors, but in Banigan v. Bard it is laid down as a universal rule."

In Synnott v. Cumberland Bldg. Loan Ass'n, 117 Fed. 379, on page 386, 54 C. C. A. 553, on page 560, the Circuit Court of Appeals of the Sixth Circuit said:

"It will not do to say that no change occurred in the attitude of the company between that action and the filing of the bill. We may take notice that the shares in such companies are constantly changing hands, and new shares being issued at short periods, constituting new series of stock. It may well be presumed that the elimination of the special powers of this common stock by the apparent consent of the stockholders would be an important factor in all the future issues of new stock and sales of old. Mrs. Synnott should have actively repudiated what was apparently done for her. Until she did so, every one had a right to suppose that she had agreed to permit her shares to stand upon a plane of equality with other prepaid shares of what is called installment stock, and to act upon that theory."

In no one of these cases were the rights of creditors in question. See, also, Banigan v. Bard, 134 U. S. 291, 10 Sup. Ct. 565, 33 L. Ed. 932.

[5, 6] It remains to consider whether the first preferred stockholders themselves can, under the circumstances of this case, attack the validity of the stock issued to them.

It is said in the petition that they contracted for stock which should have the rights mentioned in the subscription agreement.

It is difficult to see why they have not secured exactly those rights, and why, if the corporation were now a going concern, they would not have them. As has been seen, the state cannot deprive them of these rights. The assenting preferred and common stockholders cannot do so. The nonassenting common and preferred stockholders cannot. In fact, there is no one who can. They are as secure in their rights as they would have been if the amendment had been adopted by a unanimous vote of all the existing stockholders.

It may be further said that, under a proper construction of the subscription agreement, they secured exactly what they bargained for. That agreement provided that the articles "shall be amended so as to provide" for this stock. It further provided that "and it is agreed between the undersigned that when said articles have been so amended" they will take the stock. The contract did not say that the stock should be issued when the articles were amended by a unanimous vote of the existing stockholders. The petitioner claims in effect that the agreement should be amended by inserting those words. There is no evidence that any representations were made by any one that the amendment should be adopted by a unanimous vote. No one testified that when he signed the agreement he believed that such a vote was necessary to the validity of the issue. The language used in the agreement leaves no doubt but that there was contemplated such an amendment as the Minnesota statutes provided for when articles of incorporation are changed. As has been seen, these statutes did not require a unanimous vote. If the claim that the petitioner now makes be true, that a unanimous vote was required, the most that can be claimed is that the contract was signed by the subscribers under a mistake of law. Such mistake furnishes no ground for rescission. In Upton v. Tribilcock, 91 U. S. 45, on page 49 (23 L. Ed. 203) the court said:

"There was here no error, mistake, or misrepresentation of any fact. The defendant made the subscription he intended to make, and received the certificate he had stipulated for; and, as there is no evidence to the contrary, it is to be presumed that good lawyers advised as was stated. But, in law, the defendant incurred a larger liability than he anticipated."

And again on page 51 of 91 U. S. (23 L. Ed. 203):

"A statement that the insurance company had consulted with good lawyers, and that their opinion was as stated, should have been clear proof to the defendant that a representation of the law was a matter of opinion only."

There is another ground on which the petitioner's right to rescind must be denied. In Chubb v. Upton, 95 U. S. 665, on page 667 (24 L. Ed. 523), the court said:

"It is settled by the decisions of the courts of the United States and by the decision of many of the state courts that one who contracts with an acting corporation cannot defend himself against a claim on such contract, in a suit by the corporation, by alleging the irregularity of its organization. This was settled more than half a century since in the courts of the state of New York, and has recently been affirmed in this court. Dutchess Cotton Manufacturing Co. v. Davis, 14 Johns. (N. Y.) 238 [7 Am. Dec. 459]; Sanger v. Upton, 91 U. S. 56 [23 L. Ed. 220]; Upton v. Tribilcock, 91 U. S. 45 [23 L. Ed. 203]; Buffalo & Allegheny Railroad Co. v. Cary, 26 N. Y. 75; Bissell v. Michigan Southern Railroad Co., 22 N. Y. 258.

"The same principle applies to the case of a subscription to the capital stock in an organization which has attempted irregularly to create itself into a corporation, and has acted as such. Methodist Episcopal Church v. Pickett, 19 N. Y. 482; Upton v. Hansbrough, 3 Biss. 417 [Fed. Cas. No. 16,-801].

"The rule applies to increasing the stock of a corporation when the question arises upon paying a subscription for stock forming a part of such increase. The duty and the necessity of performing the contract of subscription are the same as in the case of an original stockholder."

In addition to all this, it appears that the petitioner was guilty of laches. The books of the corporation were open to its inspection, and it could at once have ascertained whether the vote adopting this amendment was unanimous or not. It made no such examination. The stockholders created by that amendment took possession of the corporation, elected their own board of directors, and managed the corporation until they put it into bankruptcy. It is now too late for them to say that they did not know that the issue was invalid.

A case much stronger than this must be made before the petitioner will be allowed "to lay aside the garb of a stockholder and on one pretense or another to assume the role of a creditor."

The result here reached has been arrived at without considering at all the point made by the trustee, that as to certain creditors the petitioner is estopped from now asserting the invalidity of his stock.

The order of the referee is affirmed.