# WRIGHT *v.* MINNÈSOTA MUTUAL LIFE INSURANCE COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 178. Argued March 15, 1904.—Decided April 4, 1904.

An insurance association organized on the assessment plan, with the consent of a majority of the policy holders and the approval of the state superintendent of insurance changed its business from the assessment to the regular premium basis under a state law permitting the change, and providing that nothing in it should impair the obligation of any contract; the original articles provided for their amendment except as to one article which was not altered or affected by the change. In an action brought by two dissatisfied holders of policies issued on the assessment basis to have the company wound up and its assets distributed on the ground that their original contract was impaired by reason of the change permitted by the state statute.

*Held,* that it is not every change in the charter of a corporation that will work such a departure from the purposes of its creation as to forfeit obligations incurred to it, or prevent its carrying on the modified business.

*Held,* that there was no vested right in a policy holder to have the original plan continued, that constituted a contract, nor did the state statute impair or operate to impair the obligation of any contract, within the meaning of the impairment clause of the constitution.

THIS case originated in a bill filed in the Circuit Court seeking to declare a dissolution of the insurance company, the sequestration of its assets, and have a receiver appointed with a view to winding up the affairs of the association. On the sixth of August, 1880, an insurance association was organized under the laws of Minnesota, known as the Bankers Association; afterwards, in 1884, its name was changed to the Bankers Life Association of Minnesota. The general purposes of the association were to secure benevolent and fraternal coöperation between its members, and pecuniary assistance, to the families of its deceased members and other designated beneficiaries. Its

general plan of operation was declared to be to assess and collect from its members and to pay over to the beneficiaries certain stipulated sums to be secured to them by sufficient pledges of money, which should be kept invested in United States registered bonds.   Male persons, not less than eighteen years nor over fifty-five years of age, approved by the medical director, were eligible to membership upon a deposit of as many dollars as such person was years of age, as a part of the "guaranty trust fund," which fund was to be a pledge to secure payment to be made by the association upon the death of members, and was to belong to the association; also a membership fee equal to half the guaranty deposit, and the proportion of the annual expense assessment for the year was required.   It was provided:

"Each member of this corporation shall pay thereto, on the last secular day of September, in each year, an assessment equal to fifteen per cent on his contribution to the 'guaranty trust fund,' to meet the operating expenses, and to be known as his 'annual dues'; and upon the death of any member each surviving member shall also pay to said corporation, on demand, an assessment equal to two per cent on his contribution to said 'guaranty' trust fund,' and out of this sum, obtained from said last-named assessment, which shall be known as the 'mortuary assessment,' there shall be paid to such beneficiary as is designated in the membership certificate the sum of money in the said certificate named.

"All assessments upon members of this corporation shall be apportioned among all members thereof pro rata, that is to say, in proportion to the amount that each member has paid into said guaranty trust fund.   All assessments due or to be paid to this corporation shall be paid to such officers or persons and at such places as the said board of trustees shall name and specify.   In order to secure prompt payment of all losses occasioned by death of its members and to avoid unreasonable expense incident to the making and collection of assessments and to promote the convenience of all parties, said assessments

need not be made on account of such death loss separately, but may be made at stated intervals as said board of trustees may direct, to provide for all or any death losses of said corporation that have taken place prior to the making of any such assessment or assessments. Any assessment for the purpose of paying any death losses shall uniformly be two per cent of each surviving member's contribution to said 'guaranty trust fund' for each such death loss, and in case any such assessment shall produce a gross amount in excess of the amount needed to pay such death losses, then such excess may be used to discharge death losses subsequently occurring."

Article X provides as follows:

"All amounts pledged to this company to secure payments of assessment, occasioned by death of the members shall be used only for that purpose and meanwhile the same shall be and remain invested in United States registered bonds, and shall constitute and be known as 'the guaranty trust fund.' Such bonds shall be made payable to this company and shall be transferable or convertible only upon resolution of its board of trustees, and such board shall have the exclusive charge and control thereof.

"All interest realized from such bonds shall meanwhile be used to defray the company's operating expenses.

"This article shall never be amended, or in any way at all changed, without the consent of every member of this company, to be given in writing signed by him, and filed with the company's secretary, and reciting in full the proposed amendment or change."

It was provided that amounts payable to beneficiaries should be collected by the company from its members, and in case of death or default on the part of any member in payment of his assessments, the association might use his deposit in the guarantee fund to pay death losses in such manner as it might deem best, such use not to work a payment of any assessment as against the defaulting member.

Upon the death of a member the beneficiary was to receive

a sum equal to two per cent of the then subsisting guaranty trust fund, not exceeding, however, two thousand dollars upon each full membership, and not exceeding in any case six thousand dollars. Power to amend the articles was vested in the trustees (except as therein otherwise provided), and they were to direct, manage and control the business of the company.

Wright became a member of the company on December 10, 1892, and Truby on March 13, 1893. On December 24, 1898, the board of trustees adopted amended articles of association and by-laws. The amended articles declared that the by-laws shall contain provisions which shall operate to preserve, continue, guard and protect all of the existing rights and privileges of and promises and pledges to persons who were members at the time the amended articles became operative.

Under the new articles a form of policy was issued, known as the "guaranteed option policy." These policies were issued to new holders, and members under the assessment plan were permitted to transfer their membership so as to receive such policies, which required the payment by the insured of a stipulated annual premium in advance. The premiums were figured upon certain tables of mortality, and approximate those which would have been charged by an old line company on the legal reserve basis. This form of policy contained a condition providing that if the fund derived from such policies shall be reduced below the amount of the reserve, the company may require the insured to pay his just proportion of the deficiency within sixty days after written request therefor; or, at the option of the company, such proportion, with compound interest thereon at the rate of four per cent per annum, may be charged as a lien against the policy and any sum which may become payable thereunder. And in another form of policy it was stipulated that if unexpected losses and expenses shall be found to have reduced the funds derived from such policies below the amount of the reserve, the company shall have the right to apportion the deficiency ratably against it and each similar

policy in proportion to its reserve, and the amount so proportioned against each policy to be an indebtedness thereon, bearing interest at four per cent per annum thereon until paid by dividends or otherwise.

Afterwards, at a regular meeting and as provided in the laws of Minnesota, General Laws of Minnesota of 1901, chapter 143, the company, on August 5, 1901, accepted the provisions of the statute making the company a regular reserve company, with a policy on which a stated premium is paid and a fixed sum is payable at death to the beneficiaries of the insured. The name of the company was changed to the Minnesota Mutual Life Insurance Company.

Section 21 of the act provides, among other things, "Any insurance company, not excepting companies transacting life or casualty business on the mortuary assessment or stipulated premium plan, or either thereof, may qualify and be governed by this chapter, anything in its special charter to the contrary notwithstanding. Provided, that nothing herein contained shall impair or operate to impair the obligation of any contract; and provided further, that after such qualification the company qualifying shall be governed solely by the act; and provided further, that nothing in this act contained shall apply to any town insurance, mortuary assessment, or stipulated premium company, unless and until it shall accept and qualify under the provisions hereof; and provided further, that notice of the acceptance of said act be filed with the insurance commissioner."

Section 1 of the by-laws of the reorganized company provides:

"Sec. 1. To the extent necessary to protect and continue the rights and privileges of any member holding a mortuary assessment certificate, and to preserve and secure the fulfillment of all contract obligations to him, and to continue and perpetuate in the company the power and authority to levy assessments and to do and perform all and everything necessary or expedient to enable it to carry out the mortuary assessment con-

tracts in accordance with the terms thereof and with the law and present by-laws in such case made and provided, the present and existing by-laws shall continue in full force and effect."

A large amount of business has been done on the new plan, and the record discloses that the company has kept its contracts, is solvent, and doing business in many States.

*Mr. John F. Byers* for appellants.

*Mr. William D. Mitchell*, with whom *Mr. Jared How, Mr. Carl Thayer* and *Mr. Timothy R. Palmer* were on the brief, for appellee.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

This is a bill on the part of two dissatisfied holders of certificates, issued while the company was doing business on the assessment plan, to wind up the affairs and distribute the assets of what appears, so far as the record disscloses, to be a solvent and prosperous mutual insurance company with which others in interest are apparently satisfied. The Federal right alleged to be invaded, and the one adjudicated upon, which gives a right of direct appeal prosecuted from the decree dismissing the bill to this court, is the constitutional guaranty against the impairment of the obligation of a contract contained in section 10 of Article I of the Constitution of the United States. The complaining certificate holders allege that the laws of Minnesota, under which the changes in the plan of the insurance business done by the defendant company were made, from the assessment to the legal reserve, flat premium plan of "old line" insurance, work a violation of that provision. As this is the groundwork of the bill in the Federal court, it becomes necessary to make a case duly invoking protection of rights secured by the Federal Constitution. The statute in question expressly

provides that it shall not operate to impair the obligation of any contract. In view of the argument that the act must necessarily have that effect, we inquire whether there was a contract with the certificate holders that the plan of insurance should never be changed. It is to be observed that the right of amendment of the articles of association, except in one particular, was reserved in the original articles of association. In article 10 it was provided that the amounts pledged to secure payment of assessments occasioned by the death of members, should be used only for that purpose, and the same should remain invested in United States registered bonds. This article, it was expressly provided, should never be amended or in any way changed, without the written consent of every member of the company. It appears that in the changes through which this company has passed this article has not been amended, and the fund has remained intact for the uses and purposes stated. It is not every change in the charter or articles of association of a corporation that will work such a departure from the purposes of its creation as to forfeit obligations incurred to it or prevent the carrying on of the modified business. A radical departure affecting substantial rights may release those who had come into the corporation on the basis of its original charter.

There is much discussion in the authorities as to when a charter amendment is of that fundamental character that a majority of the members or stockholders cannot bind the minority by agreeing to a change in the nature of the business to be carried on or the purposes and objects for which the corporation was created. Each case depends upon its own circumstances, and how far the right of amendment has been impliedly or expressly reserved in the creation of corporate rights. It would be unreasonable and oppressive to require a member or stockholder to remain in a corporation whose fundamental purposes have been changed against his will. On the other hand, where the right of amendment is reserved in the statute or articles of association, it is because the right to make changes

which the business may require is recognized, and the exercise of the privilege may be vested in the controlling body of the corporation. In such cases, where there is an exercise of the power in good faith, which does not change the essential character of the business, but authorizes its extension upon a modified plan, both reason and authority support the corporation in the exercise of the right. *Nugent* v. *The Supervisors*, 19 Wall. 241, 251; *Picard* v. *Hughey*, 58 Ohio St. 577; *Miller* v. *Insurance Company*, 92 Tennessee, 167, 185; *Supreme Lodge Knights of Pythias* v. *Knight*, 117 Indiana, 489.

In the present case we have by express stipulation the right to amend the articles, with the reservation noted as to article 10. Nor does it appear that the changes were arbitrarily made without good and substantial reason. The testimony in this record discloses that the experience of this assessment insurance company was not anomalous or unusual. It was a case of history repeating itself. Insurance payable from assessments upon members may begin with fine prospects, but the lapse of time, resulting in the maturing of certificates, and the abandonment of the plan for other insurance by the better class of risks, has not infrequently resulted in so increasing assessments and diminishing indemnity as to result in failure. The testimony that such was the history of this enterprise is ample. The changes of 1898 to a plan of issuing, in exchange for certificates and upon new business, a policy having some of the features of old line insurance, seems to have been fully justified by the state of the company's business. And the subsequent change to a policy with straight premiums and fixed indemnity was approved by the majority of the members upon proceedings had under the Minnesota statute, and has resulted in a successful business and a considerable change of the members to the new and more stable plan. It does not appear that any certificate has been unpaid, nor is any failure shown to levy assessments required under the original articles.

It is doubtless true that the assessments have increased owing to the lesser number subject to assessment and the death of

members.   What would have been realized from assessments had there been no change of plan is matter of conjecture.   The business is still that of mutual insurance, notwithstanding changed methods of operation.   The new plan has been legally adopted and approved by the insurance commissioner of the State.   The argument for appellants is that, having begun as an assessment company, the plan can never be changed without the consent of all interested.   But we have seen that the right of amendment was given in the original articles of association. There was no contract that the plan of insurance should never be changed.   On the contrary, it was recognized that amendments might be necessary.   There was no vested right to a continuation of a plan of insurance which experience might demonstrate would result disastrously to the company and its members.   We are cited to the statutes of many States authorizing similar changes and transfer of membership, but to no case holding legislative authorization of a change of this character to work the impairment by the State of the obligation of a contract.

The courts are slow to interfere with the management of societies, such as this mutual insurance company.   While the rights of members will be protected against arbitrary action, such organizations will ordinarily be left to their own methods of action and management.   The changes under consideration were made in good faith and have been accepted by many of the old members as well as those who have taken policies since the changes in plan have been made.   In our view of the case the law of Minnesota did not impair the obligation of any contract, nor were the changes in the method and plan of this company beyond its corporate powers.   There is much testimony in the record as to the good faith of this proceeding and the motives of the complainants in bringing it, which we do not deem it necessary to consider, as the conclusions announced dispose of the case in favor of an affirmance of the judgment.

*Judgment affirmed.*