8959

CLARKSON v. SUPREME LODGE K. OF P.

MILLER v. SUPREME LODGE K. OF P.

(82 S. E. 1043.)

FRATERNAL INSURANCE ASSOCIATION—RATES—REASONABLENESS OF CHANGE IN RATES.

1. INSURANCE—MUTUAL BENEFIT SOCIETY—BY-LAWS—RULES—REGULATIONS—REASONABLENESS.—When the facts are undisputed whether a by-law, rule, or regulation of an insurance society is reasonable is a question of law for the Court.

2. INSURANCE — MUTUAL BENEFIT SOCIETY — BY-LAWS — REASONABLENESS—DETERMINATION.—When the exercise of judgment and discretion is vested either by law or contract in an individual or governing body of a mutual benefit society, a reservation is implied that it must be exercised in good faith and reasonably, and in determining whether it has been so exercised the Court will not substitute its judgment for that of the indivdiual or body vested with the discretion, but the inquiry is: Does the unreasonableness of the action so clearly appear that reasonable men might not differ with reference thereto?

3. INSURANCE—MUTUAL BENEFIT SOCIETY—INCREASE OF RATES.—Where a mutual benefit insurance society was organized to furnish insurance at cost, and it appeared that the rates it was charging were so low as to peril the society's existence, the adoption of increased

FOOTNOTE.—As to validity of amendments to by-laws of fraternal benefit societies as applied to existing members, see note in Ann. Cas. 1914d, 63.

rates, which were no higher than required to pay the actual cost of carrying the risks on an adequate and equitable basis, was not objectionable as unreasonable nor as violating the contract rights of the members.

Before GAGE, J., Columbia, October, 1912. Reversed.

Two actions by E. McC. Clarkson and S. L. Miller against Supreme Lodge, Knights of Pythias, Insurance Department, tried together. From judgment for plaintiffs, the defendant appeals. The facts are stated in the opinion.

*Messrs. Weston & Aycock,* for appellant, cite: *Power of association to reclassify risks and change rates:* 117 Ind. 489; 3 L. R. A. 409; 121 Fed. 403. *Opinion of witness as to reasonableness of rates inadmissible, as that ultimate question must be determined by the Court and jury:* Jones Ev., secs. 372, 373 and 381; 32 S. C. 392. *If necessary, the rates are reasonable:* 192 Mass. 150; 78 N. E. 129; 117 Tenn. 547; 97 S. W. 306; 73 Ill. App. 321; 180 Ill. 621; 72 Am. St. Rep. 239; 117 Ind. 489; 3 L. R. A. 409; 193 U. S. 657; 180 Ill. 62; 54 N. E. 485; 131 S. W. 92; 81 Minn. 116; 83 N. W. 506; 76 Pac. 830; 108 N. W. 188. *Power confided to directors to adjust and fix rates of insurance:* 128 Mo. App. 487. *Measure of damages for wrongful cancellation of policy:* 135 S. W. 1046, reviewing 36 Hun. (N. Y.) 323; 45 Conn. 498; 95 Ind. 258; Neblack Ben. Societies, secs. 280 and 282; Bacon Ben. Societies, sec. 376; Sedgwick on Measure of Damages, sec. 30; 8 Am & Eng. Enc. of L. 632; 63 Tex. 385; 2 Tex. 148; 17 Me. 296. *Where policy was void ab initio:* 162 Mass. 236; 19 Ind. 52; 16 Pa. Supr. Ct. 607. *The North Carolina rule:* 129 N. C. 971; 54 L. R. A. 305; compare 80 Ala. 408; 5 So. 120; 19 Ind. 52; 63 N. Y. Supp. 295; 102 N. Y. 143; 72 S. W. 736. *Wrongful breach of contract:* 64 Mo. 333; 7 Mo. App. 172, 173; 28 Mo. 383; 82 Pa. 52. *The proper measure of damages is value of policy at time of cancellation:* 45 Conn. 498; 19 Ind. 53; 36 Hun. (N. Y.) 323; 41 Hun. 304; 63 N. Y.

Supp. 293; 81 Minn. 116; 83 N. W. 506; 102 N. Y. 143; 111 U. S. 267; 28 L. Ed. 426, 427; 95 Ind. 258; 18 W. Va. 400; 85 Ill. 410; 7 Neb. 66; 42 Kan. 212; 93 U. S. 24; 23 L. Ed. 792; 16 Kan. 481; 85 Ala. 401; 5 So. 120; 16 Blatclef 231; 8 Lea ('Tenn.) 488; 9 Ill. App. 358. *What is the present value?* 42 Kan. 212; 81 Minn. 116; 83 N. W. 506, and other cases.    They also cite on measure of damages for wrongful repudiation or breach of contract: 111 U. S. 264, 274; 110 U. S. 339; 123 Fed. 650; 120 Fed. 580; 3 Cooley's Briefs on Insurance 2848. *Distinction between cases where risk had attached and policies were void ab initio:* 19 Ind. 49; 65 Am. St. Rep. 392; 45 Conn. 480; 29 Am. Rep. 693. *Fraudulent breach of contract:* 70 S. C. 108. *Power of association to change its plans, and duty of members to submit to changes:* 10 U. S. 192; 6 Cranch 192; 193 U. S. 657, 663; 207 U. S. 310, 326. *Right to accumulate reserve fund:* Code 1912, sec. 2751. *The Court must determine the reasonableness of a by-law:* Bacon Ben. Soc., sec. 86; 83 Am. St. Rep. 709; 1 Cooley Briefs Ins. 711; 29 Cyc. 357; 2 Strob. L. 457; 4 DeS. Eq. 585; 92 S. C. 95. *Changes of rates have been pronounced reasonable by the Courts in:* 115 N. W. 1060; 117 Tenn. 549; 180 Ill. 621; 128 Mo. App. 497; 121 Fed. 403; 192 Mass. 150; 78 N. E. 129. *Duty of Court to direct a verdict:* 91 S. C. 17.

*Messrs. Barron, McKay, Frierson & Moffatt* and *W. Anderson Clarkson,* for respondents, submit: *The reasonableness of the change in rates was properly submitted to the jury in the charge, which should be construed as an entirety:* 95 S. C. 302; 87 S. C. 324, 327; 76 S. C. 284; 80 S. C. 557; 82 S. C. 24. *Charge on measure of damages:* 75 Am. Dec. 129; 27 Am. Rep. 558; 31 Am. Rep. 555; 83 Am. St. Rep. 699; 146 S. W. 160; 123 Fed. 650, 651, 652; 68 N. W. 892; 32 S. E. 323; 44 S. E. 659; 47 S. E. 122; 50 S. E. 221; 11 Pa. Super. Ct. 209; 64 S. W. 58; 79 S. W. 629. *No credit should be given for value of insurance during*

*time it was in force:* 69 S. W. 114; 74 Ga. 51; 29 Pac. 628; 1 Atl. 256; 127 Fed. 374; 131 Fed. 538.   *Reasonableness of by-law was to be determined by the jury:* 67 S. C. 34; 101 U. S. 263; 89 S. C. 73; 93 S. C. 537.   *So as to change of rate:* 196 N. Y. 391.

September 30, 1914.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

Plaintiffs brought these actions to recover the premiums which they paid to defendant on their policies of insurance, alleging that, on January 1, 1911, defendant breached its contracts with them by unreasonably increasing the rates, and declaring their policies forfeited, because they refused to pay the increased rates.

The Circuit Court held that the action of defendant in establishing the new rates was taken in good faith, but over-ruled defendant's motion for a directed verdict, based on the ground that the rates were reasonable, and submitted to the jury the question whether the rates were reasonable, instructing them that, if they found that they were prohibitive, or unnecessary, or arbitrary, that would make them unreasonable, and they should find for plaintiffs.   Under this instruction, the jury returned verdicts for the plaintiffs. From the judgments entered thereon, defendant appealed. The cases were tried together on Circuit and in this Court.

The exceptions impute error in the admission of evidence, in the charge as to the measure of damages, and in the refusal of defendant's motion to direct the verdicts.   If the verdicts should have been directed for defendant, the other assignments of error become speculative, and need not be considered.

Under its charter, constitution and by-laws, the power to do what was done is specifically reserved to defendant. and, in their contracts, the plaintiffs expressly agreed to that reservation.   Indeed, they do not now question the power

or authority of defendant in the premises. Their sole contention is that the action taken was unnecessary, arbitrary and unreasonable, and, therefore, void. Defendant admits that, if the power to change the rates was arbitrary or unreasonably exercised, the plaintiffs were not bound to pay the increased rates, and the forfeiture of their policies can not be sustained.

The question of paramount importance, therefore, is: Was the power unreasonably exercised? The purpose of defendant in organizing its insurance department was to give its members life insurance at actual cost. A brief recital of its efforts to do this, and the results thereof, without unnecessary or precise detail, may make the issue clearer.

In 1877, two classes were organized. In the first, certificates for $1,000 were issued to each member; in the second they were for $2,000 each. Death claims were paid by monthly assessments, the members of the first class paying $1 each, and those of the second, $2 each, without regard to their ages. Later, the third class was organized, with special features and privileges which need not be mentioned. This plan was so defective that it could not be kept up. In 1884, the fourth class was organized, on a different basis, the members being rated according to age and amount of insurance carried. The members of the other classes were allowed to transfer to the fourth, practically without restriction, except as to the rates, which were based on the age of entry, and not the attained age. Nearly all the old members transferred to the fourth class. These rates were too low, and, in 1894, they had to be supplemented by the collection of dues and extra assessments. In 1901, the mortuary fund was reduced to $8,000, while the unpaid death claims amounted to $500,000. At that time, the rates were again increased; but, as before, the members were rated at the age of entry. The result was that, in some instances, men of vastly different ages were assessed at the same rate. To illustrate: Mr. Clarkson was admitted, in 1885, at age

41, and Mr. Miller, in 1893, at age 40. Under the rating of 1901, each was assessed at his age of entry, though at that time, Mr. Clarkson was 57, and Mr. Miller 48, and Mr. Clarkson's rate was $1.85 per thousand, while Mr. Miller's was $1.75, although he was nine years younger. Under this new rating, the department appeared for a time to be in a flourishing condition, and a considerable surplus was accumulated. But the prosperity was only apparent and short lived. As the years passed, it was found that the mortuary fund was diminishing out of safe proportion to the death rate and the amount of outstanding insurance, and, at the rate of diminution, it was only a question of time, when it would be insufficient to pay the death claims. In this extremity, the defendant employed an experienced actuary, who, after examination and investigation of its insurance department, advised that a rerating upon a scientific and adequate basis was absolutely necessary to preserve its life. He advised further that this rating be based upon the American experience table of mortality, with proper addition for the expense of administration. This was done, in 1906, by organizing the fifth class, to become effective January 1, 1907. The rates were fixed as suggested, and, to prevent the accumulation of any unnecessary surplus, and give the members insurance at actual cost, it was provided that, at the end of each year, an accounting should be had, and if it should disclose a surplus equal to or exceeding one or more assessments, such surplus was to be distributed among the members by waiving that number of assessments. The members of the fourth class were urged to transfer to the fifth, and were allowed, until January 1, 1909, to do so, without expense or medical examination, but they were to be rated at their attained ages. A great majority of them tarnsferred, but many of them, plaintiffs among them, finding that their rates would be greatly increased by reason of their increased age, declined to transfer. Two extra assessments were levied on the fourth class in 1909, and three in

1910. During those years, the lapse ratio of that class increased to 21.07 and 22.80 per cent., as against 6.35 and 5.09 for the years 1907 and 1908. In August, 1910, the rates of the fourth class were increased, to become effective January 1, 1911. This new rating, like that of the fifth class, was based on the American experience table of mortality, with adequate expense loading, and the members were rerated at their attained ages. Provision was made for the annual distribution of any unnecessary surplus, by the waiving of assessments, as in the fifth class. A number of options were offered to the members of the fourth class. Among them were: 1. To continue paying the old rates for such period as said rates would give them the same protection, using the standard adopted as the basis for determining the cost of the insurance. 2. To continue paying the old rates, and scale the amount of their insurance to such a sum as those rates would carry, according to said standard. 3. To continue paying the old rates, and allow the difference between the old and new rates to be charged against their certificates as a lien thereon, the deficiency, ascertained according to said standard, to be deducted at maturity.

Under the several schedules mentioned, the assessments of plaintiffs per thousand were as follows: Mr. Clarkson, from 1885 to 1894, $1.15. From 1894 to 1901, $1.20. From 1901 to 1911, $1.85. After January 1, 1911, his rate was raised to $7.35. During the time that he was insured, his protection cost $515 more than he paid. Mr. Miller, from 1893 to latter part of 1894, $1.10. From 1895 to 1901, $1.25. From 1901 to 1911, $1.75. On January 1, 1911, his rate was raised to $4.65. At these rates his protection cost $182 less than he paid.

The necessity for increasing the rates was explained as follows: 1. The former rates were inadequate, being lower than those fixed by the experience tables of mortality. 2. No provision was made therein for the expenses of administration, which had to be deducted from the fund collected,

thereby still further impairing its sufficiency as a mortuary fund. 3. The defect in the scheme, the members being rated at their age of entry, instead of their attained ages. 4. The old rates contained no reserve element.

The reserve element of a rate is to preserve the stability of the rate, and prevent having to increase it, as the insured grows older. What is called a natural premium increases year by year with the age of the insured, but the level premium remains the same, because the amount collected at first is more than is actually necessary to pay for his protection at his then age, but if he lives out his expectancy, it would be less at the end than would be necessary. But the greater amount at the beginning (called the reserve element), with the assumed interest, prevents the necessity of any subsequent increase.

When the facts are undisputed, as they are here, the question whether a by-law, rule or regulation is reasonable is one of law for the Court. *Bussey* v. *Ry.,* 78 S. C. 352, 58 S. E. 1015; *State* v. *Earle,* 66 S. C. 202, 44 S. E. 781; *Gideon* v. *Mfg. Co.,* 44 S. C. 442, 22 S. E. 598; *Taylor* v. *Spartanburg Ry. etc. Co.,* 98 S. C. 206, 82 S. E. 404; 23 A. & E. Enc. L. (2d ed.) 584. Lord Mansfield said: "Whenever a rule can be laid down in respect to reasonableness, it should be decided by the Court, and adhered to by every one for the sake of certainty." *Tindal* v. *Brown,* 1 T. R. 167.

When the exercise of judgment and discretion is vested, either by law or contract, in an individual or governing body, a reservation is implied that it must be exercised in good faith and reasonably. In determining whether it has been so exercised, the Court will not substitute its judgment for that of the individual or body in whom the discretion has been vested. In such a case, the inquiry is: Does the action under consideration fail to measure up to any fair test of reason? If the facts and circumstances are such that reasonable men may differ as to the wisdom

and expediency thereof, the judgment and discretion of those vested with authority to decide must be upheld. It follows that a very clear case of abuse of discretion must be made out to warrant judicial interference. In *Wright* v. *Minn. Mut. L. Ins. Co.*, 193 U. S. 657, 24 S. Ct. 549, 48 L. Ed. 832, the Court said: "The Courts are slow to interfere with the management of societies, such as this mutual insurance company. While the rights of members will be protected against arbitrary action, such organization will ordinarily be left to their own methods of action and management." In *Supreme Lodge K. of P.* v. *Knight*, 117 Ind. 489, 20 N. E. 479, 3 L. R. A. 409, Chief Justice Elliott, speaking for the Court, said: "The duly chosen and authorized representatives of the members alone are vested with the power of determining when a change is demanded, and with their discretion Courts cannot interfere. Were it otherwise, Courts would control all benevolent associations, all corporations, and all fraternities. It is only when there is an abuse of discretion, and a clear, unreasonable and arbitrary invasion of private rights, that Courts will assume jurisdiction over such societies or corporations. With questions of policy, doctrine or discipline, Courts will not interfere. Courts will compel adherence to the charter, and to the purpose for which the society was organized, but they will not do more. *Standler* v. *Grand Lodge*, 3 Am. Law Rec. 589; *Crossman* v. *Massachusetts Ben. Asso.*, 3 New Eng. Rep. 517, 9 N. E. 753, 143 Mass. 435; *Hussey* v. *Gallagher*, 61 Ga. 86. The principle which rules here is strictly analogous to those which prevail in controversies between the officers and members of religious organizations; and it is well settled that in such cases the Courts will not control the exercise of discretionary powers, or direct the course of action in matters of expediency or polity."

From its inception, assessment insurance has been the subject of much controversy among those who have made the subject a study. Many experts have contended that it

was based upon unsound principles, and could not, in the nature of things, endure. The history of these organizations, according to the undisputed evidence, is that each such attempt has resulted in disappointment to those who have undertaken it. When the action of defendant is viewed in the light of its own experience, as well as the history of other like organizations, it cannot be said that it unreasonably exercised its power and authority in abandoning a rate and method of rating which has invariably resulted in failure and disappointment, and in adopting one which has been shown by actual experience to be successful. In addition to this, the course adopted was advised by an expert actuary, of large and varied information and experience, who testified that it was absolutely necessary to preserve the life of the defendant's insurance department. The plaintiff, Miller, himself an expert on the subject of insurance, testified, in response to a question of defendant's attorney: "You could not have adopted a less rate than the rate you adopted. I think the rate you adopted was an equitable rate, but you changed your contract." The testimony of defendant's expert is, therefore, corroborated in this respect by one of the plaintiffs who is qualified to speak on the subject. It is also fully corroborated by the actuary of the insurance department of this State.

According to these experts, the defendant could not have adopted a less rate, without endangering its own existence as an insurance society, and the safety of the protection upon which its thousands of members rely for the benefits of their families, when they shall be taken from them. The defendant did not undertake to insure its members at less than cost. In the nature of things, it could not do so and live. The rates and the plan adopted provide for no more than the actual cost of carrying the risks on an adequate and equitable basis. That the rerating at their attained ages falls heavily upon the plaintiffs on account of their advanced ages is not the fault of defendant.

It is their misfortune.   And, regrettable as their situation
is, it does not give them a right of action against defendant,
for they cannot in reason ask that they be carried at a rate
which is shown to be inadequate; or that they be rated at
less than their attained ages, for that would be unfair to the
younger members of the order.   The rates are not unrea-
sonably high, because they are shown to be necessary to
afford the protection given.   The action of the governing
body was based upon good and substantial reason, and,
therefore, it should not be interfered with by the Courts.

Judgment reversed.

MR. JUSTICE GAGE did not hear these cases.