[No. 18375. *En Banc.* September 23, 1924.]

NEIGHBORS OF WOODCRAFT, *Appellant,* v. H. O.
FISHBACK, *as Insurance Commissioner,*
*Respondent.*[1]

INSURANCE (192)—MUTUAL BENEFIT INSURANCE—REGULATION—
"PLAN OF WORKING"—STATUTES—CONSTRUCTION.  The working plan
of a mutual benefit insurance association covering the levying of a
monthly assessment (not actuarily conceived or mathematically
compiled) to meet all maturing claims, and additional special as-
sessment to assure an increase of accumulation equal to ten per cent
of the current mortuary losses, is not a whole life level rate plan
subject to the method of valuation for societies working on that
plan; and the same relates to affairs of internal management with
which the courts will not interfere, where it fully meets the re-
quirements of Id., §§ 7267 and 7270, which require stated periodical
contributions from members sufficient to meet all mortuary obli-
gations contracted.

SAME (192)—REGULATION—VALUATION OF CONTRACTS—METHOD—
COMPLIANCE WITH STATUTE.  Rem. Comp. Stat., § 7281, with regard
to the valuation of mutual benefit insurance societies, must be con-
strued with reference to § 7267, and without undue weight to that
portion of § 7282 requiring reduction of deficiencies in certain
cases; and the provision that the valuation shall be certified by a
competent accountant or actuary is not to be ignored; and the
society cannot be compelled to separate its membership into classes
that would destroy mutuality, uniformity, and perhaps fraternity.

FULLERTON and MACKINTOSH, JJ., dissent.

Appeal from a judgment of the superior court for
Thurston county, Wright, J., entered September 24,
1923, upon sustaining a demurrer to the complaint,
dismissing an action for an injunction.   Reversed.

*Reynolds, Ballinger & Hutson,* for appellant.

*The Attorney General* and *E. W. Anderson, Assist-
ant,* for respondent.

*George P. Steel, H. S. Elliott, Harold Preston,* and
*Abb Landis, amici curiae.*

[1]Reported in 228 Pac. 703.

TOLMAN, J.—Appellant, as plaintiff, brought this action seeking an injunction restraining the respondent, as insurance commissioner of this state, from cancelling its license, interfering in any way with its continuing its business as heretofore carried on, or enforcing, or attempting to enforce, an order theretofore made by the commissioner requiring that the contributions of new members be kept separate and apart from the other funds of the society, making such new members a separate class, and in effect, so far as the insurance features are concerned, a separate and independent society.

In its amended complaint, appellant alleges, among other things, that it is duly incorporated under the laws of the state of Oregon, has been doing business in this state since April 1, 1897, under and by virtue of the licenses duly issued by the insurance department of the state, at all times being organized and conducted solely for the mutual benefit of its members and their beneficiaries, not for profit, having a lodge system with a ritualistic form of work and a representative form of government, and making provision for and paying benefits in accordance with the laws of the state of Washington; that it has a total membership of upwards of fifty thousand, with more than sixty-four millions of dollars of insurance in force, of which membership more than seven thousand, with insurance protection to the amount of upwards of nine million dollars, are residents of this state; that, during the year 1922, it collected in benefit receipts the sum of $773,512.22, and paid out during the same period in death claims $673,500, the receipts being in the ratio of 114.7 per cent of the death claims; that in May, 1922, it prepared and filed in the office of the insurance commissioner its annual report and valuation

of its condition, and valuation of its policies as of December 31, 1921, with exhibits and notes attached, showing its possession of a benefit fund surplus in the sum of $3,331,352.98, and demonstrating as it is alleged, its complete solvency; that its members are required to pay each month monthly benefit assessments to provide for the payment of losses at rates fixed by its by-laws, in amounts according to the ages of the members at the date of their admission and the amount of benefits provided in their contracts, and in addition thereto, since January 1, 1918, its by-laws provide for special contributions to the benefit fund as follows:

"Section 162. RATIO OF BENEFIT FUND INCOME TO CLAIMS—Subd. 1.  The Benefit Fund income for each calendar year shall be maintained at a ratio of at least 10 per cent above all claims against the Benefit Fund which shall have matured in such calendar year.

"Subd. 2.—The Benefit Fund Income, in the meaning of this Section shall consist of all sums derived from regular monthly benefit assessments, and interest on deposits and investments of the Benefit Fund, including rental from the General Fund, for the property designated as Lots seven and eight, Block 220, situated in the city of Portland, Oregon.

"Section 163,—How RATIO OF BENEFIT FUND INCOME MAINTAINED—If the total Benefit Fund Income, as defined in Section 162, shall, in any calendar year beginning January 1, be not sufficient to maintain the ratio of income over claims required in section 162, additional collections from members to meet such deficiency in the Benefit Fund income shall be made as prescribed in Sections 165, 166, and 167.

"Section 164,—SPECIAL BENEFIT ASSESSMENTS—Collections made to meet the provisions and requirements of sections 162 and 163 shall be known and designated as Special Benefit Assessments.

"Section 165.—LEVY OF SPECIAL BENEFIT ASSESSMENTS.  Subdiv. 1.  When special benefit assessments

are necessary for any calendar year, to meet the provisions and requirements of sections 162 and 163, the Grand Board of Managers shall at the annual meeting in March of the succeeding year, formally direct the Grand Guardian and Grand Clerk to levy a special benefit assessment or assessments in amount sufficient to bring the Benefit Fund income for the preceding year up to the requirements.

"Subdiv. 2. Upon receiving the formal direction from the Grand Board of Managers, the Grand Guardian and the Grand Clerk shall officially issue the levy for the required special benefit assessment or assessments.

"Subdiv. 3. Liability for special benefit assessments, to cover any benefit income deficiency, under the requirements of Sections 162 and 163, shall apply only to Class A members whose certificates were in force and effect for the year in which such deficiency occurred.

"Section 166,—AMOUNT OF EACH SPECIAL BENEFIT ASSESSMENT—Each special benefit assessment shall be the same in amount for each member as the regular monthly benefit assessment paid by such member, or some definite fraction of the amount of such assessment, if less than a full assessment is necessary to attain the ratio as specified in Section 162.

"Section 167,—WHEN SPECIAL BENEFIT ASSESSMENTS ARE PAYABLE—Whenever the Grand Board of Managers directs the levy of special benefit assessments or assessments, it shall at the same time designate what month or months payments of the same shall be made by members of the Association liable therefor.

"Section 168.—SPECIAL BENEFIT FUND SURPLUS—Subdiv. 1. Should the Benefit Fund income, as defined in section 162, for any calendar year, exceed the claims against the Benefit Fund, which shall have matured in such calendar year, by more than 10 per cent, the Grand Board of Managers shall declare, under the provisions of section 137, paragraph 5, the excess of income above 110 per cent to be a free surplus, to be held and known as a special Benefit Fund Surplus.

"Subdiv. 2.    The special Benefit Fund Surplus arising under the provisions of this section shall be used only; (a) to meet or help meet any future required special benefit assessments; (b) or, in the discretion of the Grand Board of Managers, to reduce the amount of one or more regular monthly benefit assessments, payable, by all Class A. benefit members of the Association."

It is further alleged that these by-laws constitute a part of the insurance contract between the society and its members; that all of its losses are promptly met, and all benefits from it to its members are paid in full and a surplus is accumulated yearly in addition to the amount necessary to meet the demands mentioned; that, since the adoption of the by-laws quoted, special assessments have been collected from members to supplement the regular monthly assessments as required, by which means benefit funds have been collected at the ratio of 110 per cent or more of all losses payable, and that the special assessments are a part of the regular contributions made by members under their contracts, and that members are subject to the same penalty for failure to pay the special assessments as in the case of failure to pay the regular monthly benefit assessments; i. e., either may be enforced by an action at law, or the benefit contract of the member may be cancelled for non-payment of either.    It is charged that the insurance commissioner refuses to recognize the by-laws which we have quoted, or that the special assessments therein provided for are an asset to be considered; refuses to give any credit on account thereof, and has served notice, as hereinbefore indicated, requiring new members to be placed in a separate class and the funds contributed by them kept separate and apart.    It is further alleged that to comply with this demand would require appellant to aban-

don its present method of doing business; to make contracts with new members different from the contracts held by its present membership, and different from those which it and its members desire to enter into with new members, and "that such a change would discredit the present method of plaintiff in conducting its business, and would lead to a loss of many of its existing membership, and that the damage to plaintiff and its members thereby would be impossible of exact determination, but would be very great in character, and would be irreparable." To this complaint a general demurrer was interposed which was sustained by the trial court, and judgment entered dismissing the action. The plaintiff has appealed from that judgment.

Our statutes, Rem. Comp. Stat., § 7259 *et seq.* [P. C. § 3088], cover the subject of the organization and conduct of fraternal benefit societies, and the question here presented is one of construction.

Section 7281, Rem. Comp. Stat. [P. C. § 3110], among other things, provides:

"Every society transacting business in this state, shall annually, on or before the fifteenth day of February, file with the commissioner, in such form as he may require, a statement under oath of its president and secretary or corresponding officers, of its condition and standing on the thirty-first day of December next preceding, and of its transactions for one year ending on that date, and. also shall furnish such other information as the commissioner may deem necessary to a proper exhibit of its business and plan of working."

Under this provision of the statute, appellant filed its report with its plan of working as an exhibit. attached, on which the respondent's threatened adverse action is based. Respondent evidently construed this

"plan of working" to be a whole life level rate plan, and demanded that appellant's financial condition and standing be determined by the method of valuation prescribed for societies which operate on that plan. We need not here define the level rate plan, as it is well understood by those familiar with the subject, and it is sufficient to say that, in a general way, that plan is designed to provide for normal losses and to create a reserve which will care for unexpected emergencies and contingencies. Appellant's plan does not purport to be a level rate plan, first, because the stated monthly assessments are not claimed to be either actuarily conceived or mathematically computed; second, the provisions for special assessments are a material part of the working plan, and not a mere safety clause for emergencies and contingencies.

As we understand it, with the addition to its by-laws of the by-laws quoted, the plan upon which the appellant is now working covers the levying of assessments to meet all maturing claims, and in addition the levying of additional or special assessments to assure an increase in accumulations equal to ten per cent of the current mortality losses. This provision for increased accumulations saves the plan from the fatal defects inherent originally in this class of insurance which are so clearly pointed out in *Thomas v. Knights of Maccabees*, 85 Wash. 665, 149 Pac. 7, Ann. Cas. 1917B 804, L. R. A. 1916A 750. In order to remain in good standing, members must pay the additional or special assessments just as surely as they must pay the regular monthly assessments, and their failure to do so cancels their insurance and releases the appellant from the risk and all liability thereon. If they do not pay, they are suspended and the insurance risk is terminated. The exhibits to the complaint show that, since the adoption of the by-laws providing for these

special assessments, and during the years 1918 to 1921, inclusive, by the working of this plan appellant has met all maturing death losses and materially increased its reserve or surplus, and it must be apparent that, if it collects each year ten per cent in excess of all losses, it must become increasingly solvent. The plan to be selected and the determination of when and how "stated periodical contributions" shall be made by members are affairs of internal management with which the courts will not interfere. *Tolbert v. Modern Woodmen of America,* 83 Wash. 287, 145 Pac. 183; *Wright v. Minnesota Mut. Life Ins. Co.,* 193 U. S. 657; *Ross v. Modern Brotherhood of America,* 120 Iowa 692, 95 N. W. 207.

As we have seen, appellant's plan enables it to carry out its contracts in good faith and according to the will of its self-governing members, and the commissioner erred in construing it otherwise. Of course, the commissioner may and should inquire into the working of the plan and the adequacy of the assessments, but a finding against "adequacy" must be based on sufficient cause. We hold this plan to be sufficient to fully meet the requirements of §§ 7267 and 7270, Rem. Comp. Stat. [P. C. §§ 3096, 3099], which require that the stated periodical contributions by members shall be sufficient to meet all "mortuary obligations contracted, when valued upon the basis of the National Fraternal Congress Table of Mortality," unless there be something wrong with the method of valuation adopted by appellant as shown in its report to the commissioner and made a part of the complaint.

As to the method of valuation, the statute provides in § 7281, Rem. Comp. Stat. [P. C. § 3110]:

"In addition to the annual report herein required, each society shall annually report to the commissioner,

a valuation of its certificates in force on the thirty-first day of December, last preceding, excluding those issued within the year for which the report is filed, in cases where the contributions for the first year in whole or in part are used for the current mortality and expenses: Provided, that the first report of valuation shall be made as of December thirty-first, nineteen hundred and twelve. Such report of valuation shall show, as contingent liabilities, the present mid-year value of the promised benefits provided in the constitution and laws of such society under certificates then subject to valuation; and, as contingent assets, the present mid-year value of the future net contributions provided in the constitution and laws as the same are in practice actually collected. At the option of any society, in lieu of the above, the valuation may show the net value of the certificates subject to valuation hereinbefore provided, and said net value, when computed in case of monthly contributions, may be the mean of the terminal values for the end of the preceding and of the current insurance years.

"Such valuation shall be certified by a competent accountant or actuary, or, at the request and expense of the society, verified by the actuary of the department of insurance of the home state of the society, and shall be filed with the commissioner within ninety days after the submission of the last preceding annual report. The legal minimum standard of valuation for all certificates, except for disability benefits, shall be the National Fraternal Congress Table of Mortality as adopted by the National Fraternal Congress, August twenty-third, eighteen hundred and ninety-nine, or, at the option of the society, any higher table, or at its option, it may use a table based upon the society's own experience of at least twenty years and covering not less than one hundred thousand lives with interest assumption not more than four per cent per annum. Each valuation report shall set forth clearly and fully the mortality and interest basis and the method of valuation.     .     .     .

"The valuation herein provided for shall not be considered or regarded as a test of the financial solvency

of the society, but each society shall be held to be legally solvent so long as the funds in its possession are equal to or in excess of its matured liabilities.''

In construing this section of the statute, the respondent commissioner seems to have disregarded § 7267, *supra*, to which we have already referred, and to have given undue weight to that portion of § 7282, Rem. Comp. Stat. [P. C. § 3112], which provides for the reduction of deficiencies in certain cases. He also, in fixing the valuation, applies a whole life level rate plan, wholly disregarding the by-laws of 1918, and overlooks the wording of the statute permitting and requiring a society to have its valuation certified by a competent accountant or actuary, which the complaint shows was done here. A reading of the statute indicates clearly that the valuation by an actuary was not intended as an idle thing to be ignored at will. Actuaries are supposed to be experts and specialists, learned in the science of life contingencies, with expert and practical knowledge of life insurance principles, methods and management. It is to be presumed that the legislature acted with this thought in mind. The competency and accuracy of the actuarial work included in appellant's report is in effect admitted by the demurrer, and by argument only it is sought to be established that it is based upon a wrong theory.

Had we sufficient knowledge on the subject, we would not here enter into a technical discussion of the several points argued. We think, under the custom of life insurance companies generally, the valuation of appellant's outstanding contracts on the basis of one year renewable term protection was right; but if not, then that is a question to be determined after the joining of issues and hearing of evidence on both sides. So far as here appears from the record, upon which our

decision must rest, the annual ten per cent increase in accumulations, which must accrue if the appellant's plan is carried out, will be sufficient to offset the increased cost of protection to members accruing annually by reason of advance in age, and to assure this result, as mortality claims increase the surplus thus created will also increase so long as the protected members pay. When, if ever, the burden becomes too great, and the members cease to pay, that moment their insurance ends, the liability of the society ceases, and its only liability as insurer will be on pending claims based on contracts of members already deceased. We cannot say that the reserve, augmented each year up to that time by an amount at least equal to ten per cent of the death losses, will not be sufficient to care for the accrued costs.

It is too plain for argument that to separate the membership into classes would be to destroy mutuality, uniformity, and perhaps fraternity, and that is a thing to be avoided. The scope of regulation by statute, as we see it, should be (and we think our statute so intended) to prevent abuses and fraud and to assure the exercise of good faith toward the beneficiaries. Beyond that the plan of working was adopted by the members of the society through their chosen representatives; is theirs; they may change it if and as they will, and if the final results are disappointing, theirs is the responsibility.

We conclude that the demurrer to the amended complaint should have been overruled.

Reversed, and remanded with instructions to overrule the demurrer.

Main, C. J., Holcomb, Parker, Bridges, and Pemberton, JJ., concur.

FULLERTON, J. (dissenting)—As stated by the majority, the question at issue in the present controversy turns on the construction of the state statute relating to fraternal benefit societies. It is the opinion of the majority that the respondent insurance commissioner has misconstrued the statute, and has made an order with respect to the appellant society which the statute does not warrant. With this conclusion I am unable to agree, and I shall point out, as briefly as I may, the reasons why I cannot so agree.

The statute in question is found in Remington's Compiled Statutes at sections numbered from 7258 to 7292 [P. C. §§ 3145-3146], inclusive. Historically, it had its origin at a congress of representatives made up of delegates from the several fraternal benefit societies of America, held at Mobile, Alabama, in 1910. It was born of necessity. Gravestones had lined the path of fraternal benefit societies, and many of those then surviving were in the throes of dissolution. The fault of all of such societies was that they had been endeavoring to carry life insurance at less than its actual cost, and the purpose of the congress was to frame a form of an act for adoption by the legislatures of the various states which would prevent for the future the organization of societies with inadequate charges, and which would permit those then in existence to so modify their existing charges as to become gradually upon a sound financial basis. The congress also adopted a "Table of Mortality," and prescribed "a rate of stated periodical contributions" which was thought sufficient to provide for meeting the mortuary obligations contracted for death benefits by any such society. In 1911 the legislature of this state enacted into law the bill so framed, making slight changes in its text.

The law so enacted is clear in its terms as to societies formed after its enactment, and as to societies organized in other jurisdictions subsequent to that time seeking to operate in this state. It preserves the fraternal and social features of the societies found so beneficial in their past history. It provides that all such societies shall be carried on solely for the benefit of their members and their beneficiaries and not for profit; that they shall have a lodge system, with a ritualistic form of work; that they shall have a representative form of government, and it goes so far as to provide that their members, whether officers, delegates or representatives, shall vote at all times individually and not by proxy. It requires that every such society "shall provide for the payment of death benefits, and may provide for payment of benefits in case of temporary or permanent physical disability, either as the result of disease, accident or old age." To meet the obligations it thus assumes, the statute further provides that the society shall exact of each member

" . . . stated periodical contributions which shall be sufficient to provide for meeting the mortuary obligations contracted, when valued for death benefits upon the basis of the National Fraternity Congress Table of Mortality, as adopted by the National Fraternity Congress. . . . "

All such societies are placed under the supervision of the state insurance commissioner. Each society must, on or before the fifteenth day of February in each year, file with the commissioner, in such form as he may require, a sworn statement showing its condition and standing as of December 31 of the preceding year. It must also annually make and file the report provided for in the section of the statute quoted in the majority opinion as § 7281, Rem. Comp. Stat. [P. C. § 3110]. If the commissioner finds from these reports

that the statute has been complied with, he is authorized to grant to the society a license to continue its business of insurance.

At the time of the passage of the act, there were existing in this state many beneficiary societies organized under its then laws, or organized under the laws of a foreign state and permitted to do business in the state. Each of these societies had issued to its several members a beneficiary contract or certificate wherein it had agreed to pay to the beneficiary of such member a stated sum on the death of the member. Many of them, if in fact there were any exceptions, were not exacting from the member a "stated periodical contribution" sufficient to provide for meeting the mortuary obligations thus contracted, when valued for death benefits upon the basis of the table of mortality of the National Fraternity Congress before mentioned. Some of them, in fact, were not collecting stated periodical contributions at all, but were following what has become known in fraternal insurance as the assessment-as-needed plan; that is to say, the plan of assessing the surviving members in a sum sufficient to pay the loss incurred by the death of a member. This was the plan that had caused the downfall of so many fraternal insurance societies. As said by Zartman's Yale Readings in Insurance, p. 141:

"In the earlier days of the societies these assessments were generally alike in amount regardless of age and were collected only on the death of a member for the payment of his benefit, thus, as you observe, carrying out still further the idea of fraternity. But as the societies grew older the fallacies of this method were taught the members by a hard experience. By simply dropping his insurance which he had already enjoyed a member could escape paying his share of the death losses. As the members grew older and the death losses increased, those that were younger were

not long in discovering that they were contributing more than their share to the death losses, which were chiefly among the old. As a result these dropped their membership and joined younger societies. New recruits to fill their places could not be obtained. The average age of those that were left continued to increase and the assessments to grow heavier. This in turn increased the withdrawals, until at last few remained except the sick and aged. Assessments for losses could no longer be collected, and the society would dissolve, leaving a body of old and infirm deprived of the benefits for which they had so long contributed. This has been the story of scores of these societies in the past, and where otherwise honestly managed has been the cause of the numerous failures in this class of insurance. In spite of all the efforts to place assessment rates on a sounder basis, their inadequacy and inequity as between the younger and older ages still continues to threaten the permanence of a large proportion of our fraternal societies.''

As to these societies the statute makes certain special provisions. In common with the subsequently organized or subsequently admitted societies, it places them under the supervision of the state insurance commissioner, and requires them to file with that officer the annual reports and mid-year valuation reports required of such subsequently organized or subsequently admitted societies, and under the sub-title of ''Provisions to Insure Future Security,'' contains the following:

''If the valuation of the certificates, as hereinbefore provided, on December thirty-first, nineteen hundred and seventeen, shall show that the present value of future net contributions, together with the admitted assets, is less than ninety per cent of the present value of the promised benefits and accrued liabilities, such society shall be required thereafter to reduce such deficiency not less than five per centum of the total deficiency on said December thirty-first, nineteen

hundred and seventeen, at each succeeding triennial valuation. If at any succeeding triennial valuation such society does not show such percentage of improvement, the commissioner shall direct that it thereafter comply with the requirements herein specified. If the next succeeding triennial valuation after the receipt of such notice shall show that the society has not made the percentage of improvement required herein, the commissioner may, in the absence of good cause shown for such failure, institute proceedings for the dissolution of such society, in accordance with the provision of section 7283, or, in the case of a foreign society, he may cancel its license to transact business in this state.

"Any such society, shown by any triennial valuation subsequent to December thirty-first, nineteen hundred and seventeen, not to have made the improvement herein specified shall, within one year thereafter, complete such deficient improvement, or thereafter, as to all new members admitted, be subject, so far as stated rates of contribution are concerned, to the provisions of section 7270, applicable in the organization of new societies: Provided, that the contributions and funds of such new members shall be kept separate and apart from the other funds of the society until the required improvement shall be shown by valuation. If such required improvement is not shown by the succeeding triennial valuation, then the said new members may be placed in a separate class and their certificate valued as an independent society in respect to contributions and funds." Rem. Comp. Stat., § 7282.

It will be observed that in these special provisions there is no positive requirement that the old societies shall change their methods of assessment, nor is there any positive requirement that they shall collect "stated periodical contributions" sufficient to meet their mortuary obligations, when valued for death benefits upon the basis of the National Fraternity Congress table of mortality. But, as I view the statute, the legislature intended to subject them to the imposition

of certain conditions if they did not provide in some form for contributions sufficient to comply with their obligations. The legislative scheme, taken as a whole, seems to have been this: All such societies were given the time elapsing between the date the act went into effect and the end of the year 1917 to bring the then present value of their future net contributions to within ninety per centum of the then value of their promised benefits—this they were to do in their own way and by any satisfactory scheme, without let or hindrance on the part of the state insurance commissioner. If the valuation of the certificates of any society on the date fixed did not show the required per centum, the state insurance commissioner is empowered to require the society to reduce the deficiency not less than five per centum at each succeeding triennial valuation. If at any succeeding triennial valuation "such society does not show such percentage of improvement, the commissioner shall direct that it thereafter comply with the requirements herein specified;" that is to say (as I interpret the statute), shall require that the society collect stated periodical contributions sufficient in amount to provide for meeting the mortuary obligation contracted, when valued for death benefits upon the basis of the National Fraternity Congress Table of Mortality. If it does not do this, the commissioner may take one of two courses; if a local society, he may direct that proceedings be instituted for its dissolution, or, if a foreign society, may cancel its license to transact business in this state; or he may, in the alternative, require as to all new members admitted into the society that they be subjected to the stated rates of contribution applicable in the organization of new societies, and require that the contributions and funds of such new members be kept

separate and apart from the other funds of the society.

I confess that there are certain provisions contained in the act which I have difficulty in understanding, nor do I find them satisfactorily explained in the briefs of counsel. The first of these is the concluding sentence of the first paragraph of § 7281, *supra,* quoted in the majority opinion, and another is the concluding paragraph of the same section. As to the meaning of the first of these, I shall make no suggestion further than to say that I cannot think it means that a society, collecting inadequate premiums, may treat its insurance obligations as term insurance only. This is not only contrary to the tenor of the act as a whole, but it is to permit the society to practice deception; it is to permit it to induce a member to join the society by promising life insurance, whereas it only provides for insurance for a single year.

The second of the clauses I would interpret to be a limitation on the power of the insurance commissioner to direct the institution of dissolution proceedings— that it possibly means that he may not direct such proceedings so long as the funds in the possession of the society are sufficient to meet its matured liabilities, even though its immatured liabilities may exceed its possible assets; that in such an instance the commissioner is relegated to the second alternative the statute provides, namely, to require new members of the society to be admitted on stated rates of contributions required of members of societies organized, or admitted to transact business in the state, subsequent to the passage of the act.

The appellant society, as has been stated, was organized under the laws of the state of Oregon, and was permitted to transact business in this state prior

to the enactment of the fraternal insurance code. It issues contracts of insurance by which it promises to pay to the beneficiary of its individual members a stated sum on the death of the member. To meet the mortuary obligations thus contracted, its laws originally provided for the collection from each several member a stated periodical contribution, which was less than one-half sufficient for that purpose when valued for death benefits on the table of mortality adopted by the code. On this fact appearing in its 1917 report, the commissioner directed it to take the necessary steps to make up the deficiency. The society, in 1918, thereupon adopted the assessment plan shown in the by-laws set out in the majority opinion. Its annual report to the insurance commissioner for the year 1921 showed, when made in conformity with the statute, according to its complaint, "a percentage of solvency amounting to less than 50%, and showed no material increase in the ratio of solvency since December 3, 1917," and, according to the valuation of the commissioner, showed "a decrease in the percentage of solvency over that" shown in the report filed as of December 31, 1917. The commissioner thereupon sent to it the following order:

"This department is in receipt of your letter of February twenty-fourth together with warrant in the amount of $10.00 being fee for renewal of Certificate of Authority.

"Before accepting this fee in payment of Certificate of Authority, I wish to call your attention to the fact that it is the opinion of this Department that your society has not made the necessary improvement required under Section 229 of the Insurance Code of the State of Washington.

"You are, therefore, notified that on and after April 1, 1923, all new members admitted shall be subject, so far as stated rates of contributions are concerned, to

the provisions of Section 217 of the Insurance Code, applicable to the organization of new societies, and the contributions and funds of such new members shall be kept separate and apart from the other funds of the society.

"This decision is based upon the valuation as submitted to this Department under date of February 7, 1923, which statement shows a decrease in the percentage of solvency over that filed as of December 31, 1917."

It is this order the enforcement of which the society by the present action seeks to enjoin, and the order which the majority hold not warranted by the law or the facts.

It is with this conclusion that I am unable to agree. In the first place, the plan adopted does not meet the exigency of the situation. It is the old assessment-as-needed plan that has caused the downfall of all such societies as have fallen by the wayside, and the plan that the statute intended should be abandoned. I freely concede that a society which seeks by this plan to meet only one-half of its obligations will survive longer than one which seeks to meet the whole of its obligations in that manner, but it will as surely fail in the course of time as have those which have gone before. Not only has experience demonstrated this, as I have shown, but it can be and has been demonstrated by the inexorable law of mathematics. As a concrete example, where the plan has been tried and failed, I need only point to the case of *Thomas v. Knights of Maccabees,* 85 Wash. 665, 149 Pac. 7, Ann. Cas. 1917B 804, L. R. A. 1916A 750. I think, moreover, that the final result is depicted in the experience of this very society. Since the year 1918 it has been compelled to levy seven special assessments to meet its current obligations. I am aware that the necessity

for a majority of these was caused by the influenza epidemic, but I cannot think that this in any way alters the situation. Epidemics causing more than the normal loss of life for particular seasons have been constantly recurrent in the past, and will as certainly as time goes on recur in the future. These are exigencies which every insurance society must expect and prepare to meet, and this society cannot hope to prove an exception.

In the second place, I think the plan adopted is contrary to the spirit and intent of the statute. As to societies organized subsequent to the enactment of the statute, and as to foreign societies admitted subsequent to that time, the statutes require the collection of stated periodical contributions from their several members sufficient to meet the mortuary obligations assumed; which, of course, forbids an assessment-as-needed plan. As to societies previously organized, there was, it is true, no positive requirement that they change to the periodical contribution plan. But the statute gave them that opportunity, and empowered the state insurance commissioner to impose on them certain conditions if they did not do so. The commissioner, in my opinion, therefore has in this instance done nothing more than the law enjoins upon him as a duty. The reports of the society showed that its stated income was insufficient to meet its mortuary obligations. To correct this it had adopted a scheme which failed to put its finances in the condition the statute required. Since the society was actually meeting its obligations as they matured, the commissioner possibly could not cancel its license to transact business in this state, but I cannot think there is any question of his duty and authority to impose the second alternative—to require that newly admitted members into the society be put

in a separate class, and to require that there be collected from them stated contributions sufficient to meet the mortuary obligations incurred by the contracts entered into with them.

The arguments of the majority advanced in support of their position, I shall notice but briefly. It is said that the commissioner gave undue weight to the statute relating to valuations, and not sufficient weight to the report of the actuary. But if I read the statute and the report correctly, it is the actuary and not the commissioner who is in error. The report of the actuary distinctly states that his "valuation is made on the assumption of one year term insurance," whereas the contracts issued by the society are life and not one year term contracts, and the statute requires that in making the valuations they shall be so regarded.

Nor do I understand that it is the custom of life insurance companies generally to value their outstanding contracts on the basis of "one year renewable term protection;" but, if this be so, it is, to my mind, plainly not the intent of the statute under consideration as applied to fraternal insurance. Manifestly, I think, these are to be valued as life contracts, and if the contributions from the members will not mature them, there is not a compliance with the statute.

The thought implied in the concluding part of the opinion, I think, mistakes the purpose of the statute. I concede that the social and fraternal features of all such societies are an attractive part of their organization. Insurance, however, is their primary purpose. Failing in this, they fail in their primary purpose. Persons join such societies for the protection of those dependent upon them. They pay the required stated contributions and assessments in the belief that in the end given sums will be paid to their own beneficiaries.

The ordinary member knows nothing of the mathematics or the probabilities of the situation. They are given assurances that the promised sums will be paid, and trust in those who give the assurances. I, therefore, think it unjust to them to say that "if the final results are disappointing, theirs is the responsibility." At least, this was not the thought of the framers of the statute. If the purpose of the statute was not to correct this very evil, it had no purpose whatsoever.

There is a brief filed by *amici curiae* arguing against the constitutionality of the law, if it is to be interpreted as I have interpreted it. The brief is able and the argument persuasive, but I think the question has been decided adversely to the contention by our case of *Thomas v. Knights of Maccabees, supra.*

In my opinion, the judgment of this court should be an affirmance of the judgment of the court below.

MACKINTOSH, J., concurs with FULLERTON, J.